SIERRA CLUB, a non-profit California Corporation, et al., Plaintiffs-Appellees,

v.

Cecil D. ANDRUS,* as Secretary of the Interior of the United States, et al., Defendants-Appellants,

Kern County Water Agency, a public agency, et al., Intervenors-Appellants.

Nos. 76–1464, 76–1494, 76–1534, 76–1651, 76–1663 and 76–1981.

United States Court of Appeals, Ninth Circuit.

Oct. 31, 1979.

Rehearing Denied Jan. 17, 1980.

---

* Mr. Andrus is the present Secretary of the Interior. He has been substituted as an appellant for one of his predecessors who was originally named as a party in his official capacity. Rule 43(c) Fed.R.App.P.

**584**

Walter E. Wunderlich, Deputy Atty. Gen., Dept. of Justice, Sacramento, Cal., for defendants-appellants.

Robert Thum, on brief, John Clark, Margot Wenger, Pettit & Martin, San Francisco, Cal., for plaintiffs-appellees.

Michael R. Sherwood, Sierra Club Legal Defense Fund, Inc., San Francisco, Cal., on brief.

Before ELY, TRASK, and TANG, Circuit Judges.

ELY, Circuit Judge:

These appeals stem from the efforts of two environment associations and two private citizens[1] to control the pumping of water from the Sacramento-San Joaquin Delta (the Delta) into the canals and aqueducts of the California Water Project. The facts are reported fully in the excellent opinion of District Judge Renfrew. *Sierra Club v. Morton*, 400 F.Supp. 610 (N.D.Cal. 1975). After the first phase of a bifurcated trial the District Court ordered the federal[2] and state[3] defendants to obtain authorization for the operation of their pumping plants from the United States Army Corps of Engineers (the Corps), pursuant to section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403 (1970). The court also ordered the Secretary of the Army to pre-

---

1. The appellees, plaintiffs below, are the Sierra Club, a nonprofit California corporation having in excess of 130,000 members, of whom more than 40,000 are in the San Francisco Bay and Sacramento-San Joaquin Delta areas; Friends of the Earth, a nonprofit New York corporation that has its principal place of business in San Francisco; Hank Schramm, a commercial fisherman active in the San Francisco Bay and the Pacific Ocean; and William Dixon, a Sacramento-San Joaquin Delta landowner.

2. The named federal appellants, the defendants below, were federal officers who administer the various agencies responsible for overseeing the operation, construction, and regulation of the facilities in question. They were Rogers C.B. Morton, Secretary of the Interior; Gilbert Stamm, Commissioner of the Bureau of Reclamation; Howard H. Callaway, Secretary of the Army; William C. Gribble, Jr., Chief of Engineers of the South Pacific Division of the United States Army Corps of Engineers; Col. Frederick J. Rockwell, District Engineer of the Army Corps of Engineers for the Sacramento, California District; and Col. James L. Lammie, District Engineer of the Army Corps of Engi-

neers for the San Francisco, California district. Because all of these individuals were sued in their official capacity, their successors are automatically substituted as some of the appealing parties. Fed.R.App.P. 43(c).

3. The named state defendants in the District Court were Norman B. Livermore, Jr., Secretary for Resources; and John R. Teerink, Director of the Department of Water Resources. Like the federal parties, the named state appellants were sued in their official capacity, and their successors are automatically substituted as parties to the appeal in this court. Fed.R. App.P. 43(c).

The District Court also allowed the Kern County Water Agency, the Metropolitan Water District of Southern California, the Tulare Lake Basin Water Storage District, and the Santa Clara Valley Water District to intervene in these actions. The intervenors are public agencies of the State of California that have contracted for water from the California Water Project and have undertaken extensive financial obligations in reliance thereon.

pare an environmental impact statement prior to the issuance of such authorization. *Id.* at 651. In addition, the court enjoined construction on the proposed Peripheral Canal until an environmental impact statement was prepared and authorization from the Corps was obtained. The Peripheral Canal would transfer water directly from the Sacramento River to a point close to the pumping plants. Since the trial court has not yet conducted the relief phase of the bifurcated trial, it has not yet determined whether the appellees are entitled to further relief; accordingly, it has allowed the continuing operation of the pumping plants.

Here, the federal and state parties present five principal arguments. First, they contend that the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401–418 (1970) (the Act), does not create a private right of action, and that, therefore, only the United States can enforce the permit requirements of section 10.[4] Second, they contend that even if a private right of action exists, the appellees lacked standing to institute their suit. Third, it is asserted that section 10 does not apply to the pumping of water from the Sacramento-San Joaquin Delta; and fourth, if compliance with section 10 is required, such compliance already exists. Finally, the federal parties argue that since their plant, the Tracy Pumping Plant, was fully operational before the enactment of the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347 (1970 & Supp. V 1975), no environmental impact statement is necessary if a section 10 permit is required. Neither the federal nor the state parties challenge the District Court's ruling concerning the Peripheral Canal.

We have concluded that a private right of action should be implied on behalf of parties who seek to enforce compliance with the permit requirements of section 10 of the Act and that three of the four plaintiffs, having alleged particularized injuries, possess the requisite standing to avail themselves of that right. We agree with the District Court that the pumping of Delta water falls within the broad reach of section 10 and that the state parties have been exporting Delta water in violation of that provision. Unlike the District Court, however, we believe that Congress authorized the present operational level of the federal pumping plant, thereby excusing its operators from the section 10 permit requirement. Because of this second conclusion, we do not reach the final issue, i. e., whether the federal parties would be legally required to prepare an environmental impact statement before granting a section 10 permit for the federal pumping plant. We therefore affirm in part and reverse in part.

## I. FACTS

The federal and state pumping plants are integral elements of the Central Valley and State Water Projects, which, together, constitute the California Water Project. The Central Valley Project, administered by the United States Bureau of Reclamation, consists of dams, reservoirs, pumping plants, canals, and other facilities designed to generate hydroelectric power, provide flood control, and supply water for irrigation and other uses in the Central Valley of California. To this end, water from the winter runoff is stored behind dams in the Sacra-

---

**4.** Section 10 of the Rivers and Harbors Act of 1899 provides:

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended

by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

33 U.S.C. § 403 (1970).

mento River and then released, as needed, to flow down river and into the Sacramento-San Joaquin Delta, where it merges with other Delta waters. The Tracy Pumping Plant, a principal component of the Central Valley Project, pumps water from the Delta into the Delta-Mendota Canal, a 115-mile canal leading to the Mendota pool in the Central Valley. The pumping capacity of the Tracy Pumping Plant is 4,602 cubic feet per second. In 1973 this plant pumped 2,127,341 acre-feet of water from the Delta.

The State Water Project, created by the Burns-Porter Act of 1959 and now codified in Cal. Water Code §§ 12930–12942 (West 1971), is the state analogue to the Central Valley Project. It also consists of dams, canals, pumping plants, and other facilities designed to generate power, provide flood control, and transfer water from the Delta to the more arid regions of central, coastal, and southern California. The state pumping plant, known as the Delta Pumping Plant, is central to the operation of this water project. Like the Tracy Pumping Plant, it withdraws water from the Delta, pumping it into a canal, where the water ultimately is permitted to flow to its place of use. The pumping capacity of the Delta Pumping Plant is now approximately 6,300 cubic feet per second. This capacity can be increased to approximately 10,300 cubic feet per second by the installation of additional pumping units, and it is contemplated that the first of these pumps will in fact be operational by 1980. In 1973 the Delta Pumping Plant withdrew 1,261,120 acre-feet of water from the Delta. The State of California, through its Department of Water Resources, has already entered into contracts providing that at some future time the State Water Project will annually deliver 4,230,000 acre-feet of water, of which 95 percent will be pumped by the Delta Pumping Plant. With the addition of the Peripheral Canal the potential withdrawal of Delta water by both the Tracy and Delta Pumping Plants will increase to approximately 7,000,000 acre-feet in 1990 and approximately 7,750,000 acre-feet by 2020.

The pumping, past and present, has had a significant impact upon the Delta. The District Court found

> that export pumping by these facilities both lowered Delta water levels and at certain times caused net flow reversals in Delta waterways. Although it is true that the exact magnitude of these effects was not precisely established, it is clear that they are far from any sort of *de minimus* exception . . . .

400 F.Supp. at 632.[5] Before we address whether this impact falls within the Corps' regulatory jurisdiction under section 10, it is obvious that we must first determine whether plaintiffs, as private individuals, can enforce the permit requirements of that section.[6]

5. Because the Delta water flows in San Francisco Bay and is directly affected by the tidal cycle, water in the Delta channels and rivers tends to flow both up channel and down channel during the tidal cycle. For any given tidal cycle, however, there is a greater volume of flow in one direction. The amount of this excess is the net flow. A net flow reversal occurs when the net flow for a given tidal cycle is in a different direction from that of the normal direction.

The District Court considered several studies of the effect of the pumping on Delta water levels. A 1968 study, conducted by varying the pumping rates of the Tracy Plant and measuring the actual effect on water levels at various points, concluded that Delta water levels near the inlet channel of the plant were lowered .1 foot per 1000 cubic feet per second pumped. Effects of the pumping were detected as far away as the San Joaquin and Sacramento Rivers. Another study measuring the combined effect of the Tracy and Delta Plants concluded that diversion of between 9,600 cubic feet per second and 12,000 cubic feet per second during both high high and low high tides resulted in a lowered water level of 1.0 to 1.5 feet at one location near the pumping plants and almost .1 foot at a location on the San Joaquin River.

The District Court found that the above figures represented the minimum effect of the pumping plants on Delta water levels and that it was "highly probable if not certain" that an increase in the amount of pumping would result in greater effects. 400 F.Supp. at 631.

6. Prior case law has not definitively resolved the issue. Recently, our Circuit recognized an implied private right of action for damages caused by the negligent operation and maintenance of a bridge over navigable waters, al-

## II. PRIVATE RIGHT OF ACTION

To determine whether a statute contains an implied private remedy, a court should consider four separate questions. First, is the plaintiff a member of the "class for whose especial benefit the statute was enacted?" *Texas & Pacific Railway Co. v. Rigsby,* 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916). Second, is there any indication of legislative intent, explicit or implicit, either to create or to deny a private right of action? Third, do the underlying purposes of the legislative scheme conflict with private enforcement of the act? Fourth, and last, "is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975); *see Piper v. Chris-Craft Industries,* 430 U.S. 1, 37–41, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977); *Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975); *National Railroad Passenger Corp. v. National Association of Railroad Passengers,* 414 U.S. 453, 457–458, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974); *Starbuck v. City & County of San Francisco,* 556 F.2d 450, 454 (9th Cir. 1977).

Although we have found no hard and precise indication of a congressional intent to create or deny a private remedy under section 10, we believe, without significant doubt, that such a remedy does exist. The plaintiffs below are members of a class for whose benefit Congress enacted the statute, and implication of a private remedy is both consistent with the purposes of the Act and complementary to its enforcement.

### A. Beneficiaries of the Rivers and Harbors Act

■ The plaintiffs in this case who use the Delta and the San Francisco Bay also belong to the class for whose especial benefit the statute was enacted. Long ago, in 1888, the Supreme Court decided that federal common law did not prohibit obstructions and nuisances in navigable waters of the United States. *Willamette Iron Bridge Co. v. Hatch,* 125 U.S. 1, 8 S.Ct. 811, 31 L.Ed. 629 (1888). Therefore, the Court held that a private party could not obtain an injunction against the construction of a bridge over a navigable water. Congress promptly responded by enacting section 10 of the Rivers and Harbors Act of 1890, 26 Stat. 426, 454, which forbids obstructions not affirmatively authorized by law. This section, with minor changes, became section 10 of the 1899 Act. Since that time, courts have granted relief to private parties who suffer special injury because of unauthor-

---

leged to constitute violations of both section 10 and a provision of the Bridge Act of 1906, 33 U.S.C. § 512 (1970). *Riggle v. California,* 577 F.2d 579 (9th Cir. 1978). Although *Riggle* did not involve either the permit requirement of section 10 or injunctive relief, that decision strongly supports our reading of the Act. *See* 577 F.2d at 582 83.

On the other hand, in general terms the Third Circuit has stated that Congress, in exercising its regulatory authority over navigation, did not "create any civil cause of action in favor of private parties injured by any violation of the Act." *Red Star Towing & Transp. Co. v. Department of Transportation of New Jersey,* 423 F.2d 104, 105 (3d Cir. 1970). That case, however, presented a different issue, whether the 1899 Rivers and Harbors Act abrogated the eleventh amendment immunity of a state from suit in admiralty. According to the Third Circuit, Congress did not intend such a result. *Id.* at 106; *cf. Williamson Towing Co. v. Illinois,* 534 F.2d 758 (7th Cir. 1976) (regulation under

Bridge Act of 1906, 33 U.S.C. §§ 491–498 (1970), does not abrogate state immunity from suit in admiralty); *Intracoastal Transp., Inc. v. Decatur County,* 482 F.2d 361 (5th Cir. 1973) (same). *But cf. Chesapeake Bay Bridge & Tunnel Dist. v. Lauritzen,* 404 F.2d 1001, 1003 (4th Cir. 1968) (state immunity abrogated by reason of regulation under the Rivers and Harbors Act of 1899).

Here, an eleventh amendment issue is not present because appellees sought only injunctive relief requiring the State to conform its conduct to the requirements of a federal statute. *See Edelman v. Jordan,* 415 U.S. 651, 664, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). To the extent that *Red Star Towing* may be construed as holding that no private right of action exists under section 10, we disagree. *Cf. Libby Rod and Gun Club v. Poteat,* 594 F.2d 742 (9th Cir. 1979) (*sub silentio* recognition of private cause of action under section 9 of the Act) (*see* discussion of *Libby Rod and Gun Club* at note 36, *infra* ).

ized obstructions. For example, in *Neches Canal Co. v. Miller & Vidor Lumber Co.,* 24 F.2d 763 (5th Cir. 1928), a lumber company sued to recover losses caused by the construction of an unauthorized sand dam in the Neches River. The company recovered the expense it had incurred in raising its logs, which had sunk in the river because of the obstruction. In *Tatum v. Blackstock,* 319 F.2d 397 (5th Cir. 1963), a landowner with property adjacent to navigable waters sought to enjoin unauthorized dredging and filling, which would have altered the flow of the navigable waters to the detriment of his property. The court upheld a preliminary injunction against further activity until the Corps of Engineers issued a permit. Recently, our own court remanded for trial one of the consolidated appeals in *Leslie Salt Co. v. Froehlke,* 578 F.2d 742 (9th Cir. 1978), in which a private association contended that diked evaporation ponds in and around Bair Island in San Francisco Bay were built in violation of the Act because Corps permits had not been obtained.[7]

■ The federal parties argue that only the federal government is a beneficiary of the Act, relying upon an isolated statement of the Supreme Court in *Wyandotte Transportation Co. v. United States,* 389 U.S. 191, 201, 88 S.Ct. 379, 386, 19 L.Ed.2d 407 (1967), that "a principal beneficiary of the Act, if not the principal beneficiary, is the Government itself." *Wyandotte,* however, does not preclude private parties from also being recognized as beneficiaries of the Act.[8] Indeed, the Court's pronouncement, which expressly leaves open the class for whose benefit the Act was passed, was made in the context of expanding, not contracting, the remedies under the Act. As the District Court succinctly stated, "Sections 9 and 10 were enacted both to prevent injuries to private parties as a result of obstructions to navigable capacity which were not authorized by the United States and to allow the United States to regulate obstructions to the navigable capacity of its navigable waterways." 400 F.Supp. at 623 (footnote omitted).

### B. Legislative Intent

■ The legislative history of the Rivers and Harbors Act of 1899 does not reflect a congressional intent either to afford a private remedy or to deny one.[9] Nor is the

7. The intervening state water agencies contend that the Act is meant to benefit only those who are involved in navigational pursuits. The cases cited above amply refute the contention that the Act is so limited. All *users* of navigable waters are beneficiaries of the Act.

8. The Supreme Court, itself, at least *sub silentio,* has recognized others as beneficiaries of the Act. In *Wisconsin v. Illinois,* 278 U.S. 367, 49 S.Ct. 163, 73 L.Ed. 426 (1929), the plaintiffs, alleging in their complaint a violation of the Act, sought to enjoin the withdrawal of 8,500 cubic feet of water per second from Lake Michigan. The defendants, having received a permit from the Secretary of War authorizing the withdrawal, raised the Act as a defense. Significantly, the Court, not pausing to question whether plaintiffs had the right to invoke the protection of the Act, only stated that the facts pleaded by plaintiffs constituted a cause of action. *Id.* at 409, 49 S.Ct. 163. The Court then proceeded directly to a review of the defendants' activity. Finding that the defendants' permit had authorized only a temporary withdrawal of water and that absent continuing authorization the withdrawal was unlawful, the Court held that the withdrawal should be enjoined. *Id.* at 417–21, 49 S.Ct. 163. This case, standing alone, might constitute adequate au-

thority for allowing others beside the federal government to enforce the requirements of the Rivers and Harbors Act. The decision openly recognizes that others are beneficiaries of the Act's provisions.

9. The intervening state water agencies contend that the legislative history does suggest an intent to foreclose private enforcement of the Act. By amendment to a bill considered prior to the 1890 statute, which later became part of 1899 Act, the Senate eliminated language allowing suit by private persons and substituted language restricting enforcement to United States Attorneys. S.27, 50th Cong., 1st Sess., 19 Cong.Rec. 2338 (1887). A close reading of the amendment, however, discloses that the Senate was addressing the question whether a private party could enforce the penal provisions of the legislation. It is generally agreed that such *qui tam* actions are not permitted. *See, e. g., Jacklovich v. Interlake, Inc.,* 458 F.2d 923 (7th Cir. 1972); *Connecticut Action Now, Inc. v. Roberts Plating Co.,* 457 F.2d 81 (2d Cir. 1972). The amendment does not indicate a legislative intent to preclude other private actions under the 1899 Act.

statutory language itself determinative. Section 12 of the Act provides for the enforcement of section 10, making a violation of section 10 a misdemeanor punishable by either a fine or imprisonment and authorizing a district court to enjoin the violation.[10] Section 17 of the Act, in conjunction with section 12, places the duty of enforcement upon the Attorney General and the Department of Justice.[11]

Normally, these express statutory provisions would imply that no other means of enforcement are intended, with only clear contrary evidence of a legislative intent to rebut this presumption. *See Securities Investor Corp. v. Barbour, supra,* 421 U.S. at 419, 95 S.Ct. 1733; *National Railroad Passenger Corp. v. National Association of Railroad Passengers, supra,* 414 U.S. at 458, 94 S.Ct. 690. This principle, however, does not apply to the Rivers and Harbors Act of 1899. The Supreme Court has consistently construed the Act's language in a manner apparently aimed toward effectuating the underlying statutory policies. *See, e. g., Wyandotte Transp. Co. v. United States, supra,* 389 U.S. at 201, 88 S.Ct. 379; *United States v. Republic Steel Corp.,* 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960). The Court has already determined that the penal provisions of the Act do not preclude implication of a civil action. *Cort v. Ash, supra,* 422 U.S. at 79, 95 S.Ct. 2080. *Wyandotte Transp. Co. v. United States, supra,* 389 U.S. at 201–202, 88 S.Ct. 379. Accordingly, we believe that the Attorney General's enforcement responsibilities were not meant to foreclose the implication that private actions are authorized to promote the purposes of section 10.[12] Rather,

---

**10.** Section 12 provides:

Every person and every corporation that shall violate any of the provisions of sections 401, 403, and 404 of this title or any rule or regulation made by the Secretary of the Army in pursuance of the provisions of section 404 of this title shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) not exceeding one year, or by both such punishments, in the discretion of the court. And further, the removal of any structures or parts of structures erected in violation of the provisions of the said sections may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States.

33 U.S.C. § 406 (1970). Although this section expressly mentions enjoining only the erection of "structures" in violation of section 10, it is now settled that a District Court may enjoin any obstruction that violates section 10. *United States v. Republic Steel Corp.,* 362 U.S. 482, 491–92, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960).

**11.** Section 17 provides:

The Department of Justice shall conduct the legal proceedings necessary to enforce the provisions of sections 401, 403, 404, 406, 407, 408, 409, 411, 549, 686, and 687 of this title; and it shall be the duty of United States attorneys to vigorously prosecute all offenders against the same whenever requested to do so by the Secretary of the Army or by any of the officials hereinafter designated, and it shall furthermore be the duty of said United States attorneys to report to the Attorney General of the United States the action taken by him against offenders so reported, and a transcript of such reports shall be transmitted to the Secretary of the Army by the Attorney General; and for the better enforcement of the said provisions and to facilitate the detection and bringing to punishment of such offenders, the officers and agents of the United States in charge of river and harbor improvements, and the assistant engineers and inspectors employed under them by authority of the Secretary of the Army, and the United States collectors of customs and other revenue officers shall have power and authority to swear out process, and to arrest and take into custody, with or without process, any person or persons who may commit any of the acts or offenses prohibited by the said sections, or who may violate any of the provisions of the same: *Provided,* That no person shall be arrested without process for any offense not committed in the presence of some one of the aforesaid officials: *And provided further,* That whenever any arrest is made under such sections, the person so arrested shall be brought forthwith before a commissioner, judge, or court of the United States for examination of the offenses alleged against him; and such commissioner, judge, or court shall proceed in respect thereto as authorized by law in case of crimes against the United States.

33 U.S.C. § 413 (1970).

**12.** Examining a similar statutory scheme, the Supreme Court held that a provision expressly providing for enforcement by the Attorney

[w]e read the 1899 Act charitably in light of the purpose to be served. The philosophy of the statement of Mr. Justice Holmes . . . that "A river is more than an amenity, it is a treasure," forbids a narrow cramped reading either of § 13 or of § 10.

*Republic Steel Corp., supra,* 362 U.S. at 491, 80 S.Ct. at 890.

### C. Consistency with Legislative Scheme

Our third inquiry concerns the consistency of implying a private right of action under section 10 with the underlying purposes of the legislative scheme. We perceive a private right of action as both consistent with the purposes of the Rivers and Harbors Act and complementary to its enforcement.

■ Section 10 prohibits unreasonable obstructions to navigable capacity, and in those instances specifically enumerated in its second and third clauses, the statute directs the Secretary of the Army, acting upon the recommendation of the Chief of Engineers, to determine what constitutes an unreasonable obstruction. *Wisconsin v. Illinois,* 278 U.S. 367, 413, 49 S.Ct. 163, 73

L.Ed. 426 (1929). The underlying purpose of section 10 is clear. That purpose is to keep the navigable waters of the United States free from unreasonable obstructions. Private suits such as the present one promote this policy by assuring Corps review of those activities that could obstruct the navigable capacity of the Nation's waters by altering or modifying their course, condition, or capacity.[13]

■ The District Court reasoned that exclusive enforcement of the criminal provisions should be vested in the Attorney General but that the Attorney General had neither the time nor the resources to seek redress for all violations of the Act. 400 F.Supp. at 624–25. The court concluded that a private right of action was necessary to protect private parties who suffer special injuries because of these violations. *Id.* at 625. We agree,[14] but we do not rest this conclusion solely upon recognition of the Attorney General's lack of resources. An additional problem, exemplified by this case, is that the federal government, which is specifically directed to enforce the Act, may itself be charged with violating its provisions.[15] Unless private rights of action are permitted, federal violations could oper-

General did not preclude implication of a private remedy. In *Allen v. State Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), the Court identified a private right of action to enforce the Voting Rights Act of 1965, 42 U.S.C. §§ 1973–1973p (1970), notwithstanding an express provision that "the Attorney General may institute . . . an action for preventive relief," *id.* § 1973(j). 393 U.S. at 554–57, 89 S.Ct. 817.

Like the Voting Rights Act of 1965, the Rivers and Harbors Act of 1899 provides that "proper proceedings . . . may be instituted under the direction of the Attorney General of the United States." 33 U.S.C. § 406 (1970). As in *Allen,* the express reference does not necessarily preclude a private right of action. Rather, we must further determine whether it would be consistent with the broad purposes of the Act to imply such a remedy.

13. We do not mean to imply that the Corps should consider only navigational interests when issuing a permit. Since the passage of the 1899 Act, Congress has enacted additional legislation directing federal officials to consider ecological and environmental effects in addition to navigation when discharging their duty. *See, e. g.,* Fish and Wildlife Coordination Act,

16 U.S.C. §§ 661–666c (1976); National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347 (1970 & Supp. V 1975). *See generally Zabel v. Tabb,* 430 F.2d 199 (5th Cir. 1970), *cert. denied,* 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971).

14. *See generally River v. Richmond Metropolitan Auth.,* 359 F.Supp. 611 (E.D.Va.), *aff'd,* 481 F.2d 1280 (4th Cir. 1973).

15. In this respect, the federal appellants base one of their arguments against upholding a private right of action on the contention that to allow such an action would amount to finding an implied waiver of sovereign immunity. We, however, have the obligation to ensure federal compliance with those measures enacted by Congress to protect the environment. To the extent that the involved federal officials have exceeded their statutory authority or have exercised that authority in an illegal manner, this suit falls within one of the well recognized exceptions to sovereign immunity. *City of Santa Clara v. Andrus,* 572 F.2d 660, 679·(9th Cir.), *cert. denied,* 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978); *Association of Northwest Steelheaders v. United States Army Corps of*

ate so as to wholly frustrate the purposes of the Act. *See Illinois ex rel. Scott v. Hoffman,* 425 F.Supp. 71, 75–76 (S.D.Ill.1977); *cf. Miller v. Mallery,* 410 F.Supp. 1283, 1289 (D.Or.1976).

Unlike the possible result faced by the Supreme Court in *Securities Investor Protection Corp. v. Barbour, supra,* 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263, and *National Railroad Passenger Corp. v. National Association of Railroad Passengers, supra,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646, implication of a private remedy under section 10 does not raise the spectre of judicial encroachment upon executive policymaking. It is not here argued that the Corps cannot issue permits for the continued operation of the Tracy and Delta Pumping Plants. The Corps can grant to the appropriate federal and state officers permission to continue their pumping operations. If permits are properly obtained, the right of the appellees to enforce section 10 will not then extend so as to entitle them to obtain redress for their injury. It remains true that the Congress and the Corps ultimately decide which activities affecting navigable waters are permissible.[16]

**D.** *State Law*

 Finally, we hold that this case is not the type of action traditionally relegat-

ed to state law. The appellants focus on allegations of the possible adverse effects upon fish and wildlife, contending that these are basically state concerns to be remedied under the law of nuisance. This approach is much too narrow. Activities affecting the navigable capacity of navigable waters of the United States are matters of federal, not state, law. *Wyandotte Transportation Co. v. United States, supra,* 389 U.S. at 201, 88 S.Ct. 379. We agree with the District Court that

> [t]here is a federal interest in protecting persons from injuries resulting from unauthorized obstructions to the navigable capacity of navigable waters of the United States and possible federal intrusion into the area of state nuisance law is necessary so that the federal interest asserted here will not be compromised by contrary state law.

400 F.Supp. at 625.

 We emphasize, even though such emphasis should be unnecessary, that our decision does not permit private parties to enforce the criminal provisions of the Rivers and Harbors Act. The Act does not authorize *qui tam* actions [17] to enforce its criminal penalties. Section 17 of the Act, 33 U.S.C. § 413 (1970), vests exclusive en-

---

*Eng'rs,* 485 F.2d 67, 69 (9th Cir. 1973); *Washington v. Udall,* 417 F.2d 1310, 1314 (9th Cir. 1969).

**16.** This result distinguishes *Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975) and *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974), two Supreme Court cases in which no private rights of action were found to exist. In both of those cases, the plaintiffs sought to challenge decisions made by corporate entities created by Congress to solve public problems. Had the Court recognized a private right of action, the subsequent litigation would have undercut the decisions of the corporations, thus upsetting the legislative scheme devised by Congress. *Securities Investor Protection Corp. v. Barbour, supra,* 421 U.S. at 422–23, 95 S.Ct. 1733; *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers, supra* 414 U.S. at 463, 94 S.Ct. 690. Additionally, in both instances, the legislation and its relevant history indicated an attempt to pre-

clude private rights of action. *Securities Investor Protection Corp. v. Barbour, supra* 421 U.S. at 420 n. 3, 421, 95 S.Ct. 1733; *National R.R. Passengers Corp. v. National Ass'n of R.R. Passengers, supra,* 414 U.S. at 457–61, 94 S.Ct. 690. Thus, no private right of action was found to exist.

Here, the private right of action asserted by the appellees is not aimed at the decisions of the agency enforcing the Act. They are not challenging the issuance of permits, nor are they attempting to require the United States to prosecute a party for violation of the Act. Rather than attempting to disrupt the legislative scheme, the appellees are seeking to enforce that scheme.

**17.** A *qui tam* action is a civil proceeding in which an informer sues for the Government, as well as for himself, to recover a penalty under a particular statute. Statutory authority for the action must be specifically provided. *Connecticut Action Now, Inc. v. Roberts Plating Co.,* 457 F.2d 81, 84 (2d Cir. 1972).

forcement of its penal provisions in the Department of Justice. *Jacklovich v. Interlake, Inc.,* 458 F.2d 923 (7th Cir. 1972); *Connecticut Action Now, Inc. v. Roberts Plating Co.,* 457 F.2d 81 (2d Cir. 1972); *Durning v. ITT Rayonier, Inc.,* 325 F.Supp. 446 (W.D.Wash.1970). Nor do we intend to hold that private parties may sue on behalf of the general public or seek to enjoin violations of section 13 of the Act, 33 U.S.C. § 407 (1970). These questions are not before us, but there is good and sufficient reason to express our thought that this responsibility is also committed exclusively to the Department of Justice. *See Connecticut Action Now, supra* at 88–89; *Guthrie v. Alabama By-Products Co.,* 328 F.Supp. 1140, 1144–48 (N.D.Ala.1971), *aff'd,* 456 F.2d 1294 (5th Cir. 1972), *cert. denied,* 410 U.S. 946, 93 S.Ct. 1352, 35 L.Ed.2d 613 (1973); *Bass Angler Sportsman Society v. United States Steel Corp.,* 324 F.Supp. 412, 416 (N.D., M.D., S.D.Ala.1971), *aff'd,* 447 F.2d 1304 (5th Cir. 1971) (per curiam).

■■■ Accordingly, we hold that private parties who suffer special injuries because of unauthorized activities affecting the navigable capacity of our Nation's waters may sue to enforce the permit requirements of section 10. There are no indicia of legislative intent to exclude a private right of action, and without this remedy, users of the Delta and the San Francisco Bay would be unable to obtain Corps review of the activities that are causing them injury.

## III. STANDING

The intervening state water agencies contend that the appellees lacked standing to bring their action. Under the Supreme Court cases of *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), and *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), as succinctly summarized by us in *Bowker v. Morton,* 541 F.2d 1347 (9th Cir. 1976), a plaintiff must allege "(a) a particularized injury (b) concretely and demonstrably resulting from defendants' action (c) which injury will be redressed by the remedy sought." *Id.* at 1349.

The individual appellees meet the standard.[18] Both have alleged a particularized injury caused by the pumping, and, although the injury may continue if the Corps eventually allows continued pumping, it may be redressed if the Corps restricts or regulates the pumping operation. Unlike the plaintiffs in *Simon v. Eastern Kentucky Welfare Rights Organization, supra,* 426 U.S. 26, 96 S.Ct. 1917, who sued the Secretary of the Treasury to contest a revenue ruling favorable to nonprofit hospitals offering only emergency room services to indigents, the individual plaintiffs' injury

---

**18.** The District Court found:

Plaintiffs in this case are The Sierra Club, Friends of the Earth, Hank Schramm, and William Dixon. The Sierra Club is a nonprofit California corporation having in excess of 130,000 members of whom more than 40,000 live in San Francisco Bay and the Sacramento-San Joaquin Delta areas. Included in the membership of the Sierra Club are many persons who use the waters referred to in the complaint for recreational purposes, including, but not limited to, boating, fishing and swimming. The stated purposes of the Sierra Club included the preservation and conservation of the natural resources, fish, and wildlife of the United States, including its rivers, bays, wetlands, deltas, and estuarine areas.

Friends of the Earth is a nonprofit New York corporation which has its principal place of business in San Francisco. Its stated purposes include the preservation, restoration, and rational use of the environment.

Hank Schramm is and has been engaged for the past 20 years in the business of commercial fishing and the operation of sports fishing and party boats in the San Francisco Bay and the Pacific Ocean. Schramm has an economic interest in this controversy since he depends for his livelihood on the maintenance, preservation, and conservation of sports and commercial fisheries in the San Francisco Bay and the adjoining waters of the Pacific Ocean.

William Dixon owns substantial property in the Delta, including a partnership interest in the St. Germain Duck Club on Simmons Island, and consequently has an economic interest in the maintenance, preservation, and conservation of adequate non-polluted supplies of water in the Delta and San Francisco Bay regions.

400 F.Supp. at 619.

"can be traced to the challenged action of the defendant, and [is] not injury that results from the independent action of some third party not before the Court." *Simon, supra* at 41–42, 96 S.Ct. at 1926.[19]

The intervenors further contend that the appellees did not meet the second standing requirement, a nonconstitutional requirement, that "the interest sought to be protected by the complainant [is] arguably within the zone of interest to be protected or regulated by the statute in question." *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970); *Simon v. Eastern Kentucky Welfare Rights Organization, supra,* 426 U.S. at 39, n.19, 96 S.Ct. 1917. The intervenors' argument is founded upon their belief that the zone of interest to be protected encompasses only navigational pursuits, a tenet that is incorrect. Under section 10 the Corps must consider not only the effect of an activity upon navigation, but also its impact upon the environment. *United States v. Joseph G. Moretti, Inc.,* 526 F.2d 1306, 1310 (5th Cir. 1976); *Zabel v. Tabb,* 430 F.2d 199, 213–14 (5th Cir. 1970), *cert. denied,* 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971). We therefore hold that the appellees' interest in the environmental quality of the Delta and San Francisco Bay is within the zone of interests protected under the Rivers and Harbors Act. *See Alameda Conservation Association v. California,* 437 F.2d 1087, 1091 (9th Cir.), *cert. denied,* 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 649 (1971) (standing for private party alleging injury to fish).

Because the individual appellees possess the requisite standing to maintain this suit, it would ordinarily be needless for us to consider whether the environmental associations also have standing. *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 263–64 & n.9, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Since the second portion of the bifurcated trial has not yet occurred, however, we think it desirable to offer some procedural guidelines to the District Court. We shall address the issue briefly. An organization's abstract concern with a subject is insufficient to confer the requisite standing, *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), but when the organization fails to allege an injury to itself as an organization, it can establish standing by showing that it represents individual members who have themselves suffered injury and who thus could have properly sued in their own right. *Simon v. Eastern Kentucky Welfare Rights Organization, supra,* 426 U.S. at 40, 96 S.Ct. 1917; *Warth v. Seldin, supra,* 422 U.S. at 511, 95 S.Ct. 2197. The Sierra Club has satisfied the test by alleging injuries to members who use the San Francisco Bay for boating and recreational purposes. Friends of the Earth, on the other hand, has not met the requirement. It has alleged nothing more than a general organizational interest in preservation of the environment.[20] Thus, it has no standing to invoke judicial resolution of the controversy. The judgment of the District Court is vacated as to Friends of the Earth, and upon remand the District Court will dismiss the complaint as to Friends of the Earth.

## IV. SECTION 10 OF THE RIVERS AND HARBORS ACT OF 1899

We now turn to the merits. First, the appellants attack the trial court's decision

**19.** The intervenors argue that no evidence of injury to these plaintiffs was adduced at trial, and, thus, that the appellees were without standing. Under the pretrial order, however, the District Court has deferred taking evidence relating to the environmental effect of the pumping upon the Delta and the San Francisco Bay until the second phase of the trial, which has not yet occurred. Certainly, the intervenors do not dispute that there is evidence that the pumping has caused net flow reversals and lowered water levels in the Delta. The appellees have sufficiently alleged a demonstrable, particularized injury that may result from the pumping activities, and they will have the opportunity to prove their injury in the second portion of the bifurcated trial.

**20.** *See* note 18, *supra.*

on the scope of section 10 of the Rivers and Harbors Act of 1899.[21]

The statute contains three distinct proscriptive clauses. The first clause flatly prohibits the creation of any obstruction to "the navigable capacity of any of the waters of the United States" unless affirmatively authorized by Congress. The second and third clauses, on the other hand, permit certain activities in navigable waters provided that they proceed on plans "recommended by the Chief of Engineers and authorized by the Secretary of the Army." These activities include the building of structures in navigable waters and the alteration or modification "in any manner" of the condition, capacity, or channel of any navigable water.

The District Court held that

> the operation of the Tracy and Delta Plants obstructs the navigable capacity of various waters in the Delta, and because these obstructions are the result of the modification or alteration of the condition or capacity of the channel of navigable water, they are governed by the third clause of Section 10.

400 F.Supp. at 638. In so ruling, the court accepted the convincing factual evidence

that export pumping by the Tracy and Delta facilities had lowered the level of navigable waters in the Delta by as much as 1.5 feet in at least one place and had caused net flow reversals in certain channels.[22] The District Court apparently believed that the controlling issue was whether a given diversion constituted an obstruction to navigable capacity.[23]

[17] We decline to adopt the District Court's approach, believing that it would necessarily present the courts with difficult definitional problems in a variety of factual contexts. Instead, we interpret clauses 2 and 3 of section 10 as constituting a legislative enumeration of specific obstructions to navigable capacity that require Corps authorization. In other words, the building activities mentioned in clauses 2 and 3 are *presumed* to be obstructions to navigable capacity. Under the statute the Secretary of the Army determines whether these obstructions are reasonable. Thus, the facts in this case should be analyzed from the standpoint of whether there has been any modification or alteration of the condition or capacity of a navigable stream, rather than first determining whether there has

---

**21.** *See* note 4, *supra.*

**22.** In their opening brief the state appellants assert that the trial court entertained "the mistaken belief" that water levels on the San Joaquin River would be lowered by 1.5 feet at low tide, a fact which was disputed by the testimony of a civil engineer with the California State Department of Water Resources. Brief for Appellants Norman Livermore and John Teerink [hereinafter cited as State Opening Brief] at 13. The District Court opinion, however, explicitly notes the difference of opinion as to the amount of diversionary impact on San Joaquin River levels. 400 F.Supp. at 630 n.27. The court clearly rested its finding of obstruction to navigable capacity on separate evidence that the water level would recede at least 1 to 1.5 feet in the vicinity of Clifton Court Ferry and that operation of the pumping plants was causing net flow reversals on the San Joaquin River and the Old and Middle Rivers. *Id.* at 631–32.

**23.** The court defined "navigable capacity" as "the capacity for navigation over any part of the waters in question when in their normal condition," and defined "obstruction to navigable capacity" as "to interfere with or diminish

the navigable capacity of the waterway in question." 400 F.Supp. at 630 n.23 (*citing United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 709, 19 S.Ct. 770, 43 L.Ed. 1136 (1899), and *Hubbard v. Fort*, 188 F. 987, 996 (C.C.D.N.J.1911)). The court observed that in *Rio Grande* the Supreme Court had stated that not every appropriation of the upper waters of a navigable stream would constitute an "obstruction" to navigable capacity: "The question always is one of fact, whether such appropriation *substantially* interferes with the navigable capacity within the limits where navigation is a recognized fact." *Rio Grande, supra,* 174 U.S. at 709, 19 S.Ct. at 777, *cited at* 400 F.Supp. at 630 n.24 (emphasis added). The question thus becomes whether in a given case a proved effect on navigable waters is substantial enough to constitute an obstruction to navigable capacity. The difficulty with this approach is that it emphasizes too strongly the question whether an "obstruction to navigable capacity" has occurred at the expense of the different question whether there has been any alteration or modification of the condition or capacity of navigable waters.

been an obstruction to navigable capacity.[24] When one undertakes any of the activities described in clause 2 or by his activities brings about any of the results specified in clause 3, he violates section 10 if he has not first sought and obtained a permit from the Corps of Engineers.

In *Sanitary District v. United States,* 266 U.S. 405, 45 S.Ct. 176, 69 L.Ed. 352 (1925), the Supreme Court, construing the Rivers and Harbors Act of 1899, held that the diversion of water from Lake Michigan by the Sanitary District of Chicago fell within the scope of section 10 and was therefore beyond the power of a state in the absence of specific authorization by the Corps of Engineers. The Court referred to the fact that the Secretary of War had reviewed the Chicago Drainage Channel diversions in 1913, "including the obvious fact that so large a withdrawal would lower the levels of the Lakes and the overwhelming evidence that it would affect navigation." *Id.* at 430, 45 S.Ct. at 180. Nevertheless, Mr. Justice Holmes, for the Court, made no specific findings or determinations as to the effect on the actual navigable capacity of the lakes and rivers affected. The Court wrote:

> Evidence is sufficient, if evidence is necessary, to show that a withdrawal of water on the scale directed by the statute of Illinois threatens and will affect the level of the Lakes, and that is a matter which cannot be done without the consent

of the United States, even were there no international covenant in the case.

\* \* \* \* \* \*

It is a broad expression of policy in unmistakable terms, advancing upon an earlier Act of September 19, 1890, . . . which forbade obstruction to navigable capacity "not affirmatively authorized by law" . . . .. There is neither reason nor opportunity for a construction that would not cover the present case. As now applied it concerns a change in the condition of the Lakes and the Chicago River, admitted to be navigable, and, if that be necessary, an obstruction to their navigable capacity, . . . without regard to remote questions of policy. It is applied prospectively to the water henceforth to be withdrawn. This withdrawal is prohibited by Congress, except so far as it may be authorized by the Secretary of War.

266 U.S. at 426, 429, 45 S.Ct. at 179–180.

■ Four years later, in *Wisconsin v. Illinois, supra,* 278 U.S. 367, 49 S.Ct. 163, 73 L.Ed. 426, the Supreme Court again dealt with massive diversions by the Sanitary District of Chicago, which had lowered, by "not less than six inches," the levels of Lakes Michigan, Huron, Erie, and Ontario, their connecting waterways, and the St. Lawrence River above tidewater. *Id.* at 400, 49 S.Ct. 163. Chief Justice Taft wrote:

---

**24.** The intervening appellants insist on the narrowest possible definition of navigable capacity. They argue that, in order to show the existence of an obstruction to navigable capacity, plaintiffs must prove, "among other things," the types of vessels that utilize a particular channel, the natural capacity of that channel to accommodate such navigation, the "navigational pursuits" of these types of vessels, and the degree to which changes in the condition or capacity of the channel may interfere with such pursuits. Brief for Intervenors and Appellants Kern County Water Agency, et al. [hereinafter cited as Intervenors' Brief] at 37–38. We fail to see any meaningful distinction between this definition of obstruction to "navigable capacity" and a showing of some effect on "actual navigation." Moreover, this argument of the intervenors is based on a fundamentally fallacious interpretation of section 10 and its three

clauses, the premise of which is that under section 10 of the Rivers and Harbors Act of 1899,

> [n]ot all construction or work of the type described in Clauses 2 and 3 require approval of the Secretary of the Army. Section 10 approval is not required unless the structure or work would create some kind of obstruction, and then the Secretary is called on to determine the obstruction's reasonableness.

*Id.* at 35. This interpretation, which introduces the requirement of a procedural determination of substantial obstruction to navigable capacity prior to submission to the Corps for approval, leaves unaddressed the obvious problem of who is responsible for actually making the interpretation. As we see it, our acceptance of this construction of section 10 would stand the statute on its head.

[T]he broad words of the first clause of . . . [section 10] were not intended to limit the second and third clauses and . . . *Congress' purpose was a direct prohibition of what was forbidden by them except when affirmatively approved by the Chief of Engineers and the Secretary of War. . . .*

The true intent of the Act of Congress was that unreasonable obstructions to navigation and navigable capacity were to be prohibited, and *in the cases described in the second and third clauses of Section 10,* the Secretary of War, acting on the recommendation of the Chief of Engineers, was authorized to determine *what in the particular cases constituted an unreasonable obstruction.*

278 U.S. at 413, 49 S.Ct. at 170 (emphasis added). In short, the Corps must authorize any of the structures or activities enumerated in clauses 2 and 3, which are *presumed* to constitute obstructions. The need for applying to the Corps for a permit does not depend on some prior determination that there has been an obstruction to navigable capacity.

 Even more explicit is the opinion of the Supreme Court in *United States v. Republic Steel Corp., supra,* 362 U.S. 482, 80 S.Ct. 884. There, the Court held that the unauthorized deposit of industrial solids in the Calumet River, which reduced its depth by four to nine feet in some places, constituted an obstruction to navigable capacity and thus a violation of section 10. The Court carefully distinguished between the three clauses of the section:

The reach of § 10 seems plain. Certain types of structures, enumerated in the second clause, may not be erected "in" any navigable river without approval by the Secretary of the Army. Nor may excavations or fills, described in the third clause, that alter or modify "the course, location, condition, or capacity of" a navigable river be made unless "the work" has been approved by the Secretary of the Army. There is, apart from these particularized invasions of navigable rivers, which the Secretary of the Army may approve, the generalized first clause which prohibits "the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity" of such rivers. *We can only conclude that Congress planned to ban any type of "obstruction," not merely those specifically made subject to approval by the Secretary of the Army. It seems, moreover, that the first clause being specifically aimed at "navigable capacity" serves an end that may at times be broader than those served by the other clauses. Some structures mentioned in the second clause may only deter movements in commerce, falling short of adversely affecting navigable capacity. And navigable capacity of a waterway may conceivably be affected by means other than the excavations and fills mentioned in the third clause.* We would need to strain hard to conclude that the only obstructions banned by § 10 are those enumerated in the second and third clauses. *In short, the first clause is aimed at protecting "navigable capacity," though it is adversely affected in ways other than those specified in the other clauses.*

362 U.S. at 486–87, 80 S.Ct. at 887–888 (emphasis added). Clearly, the structures and activities set forth in the second and third clauses need not be shown to obstruct navigable capacity before federal authorization is required by the terms of the statute.

 Finally, recent Fifth Circuit authority has established beyond cavil that an alteration or modification of navigable waters is sufficient to trigger the permit requirement of section 10 of the Rivers and Harbors Act. In *United States v. Joseph G. Moretti, Inc. (Moretti I),* 478 F.2d 418, 429 n.37 (5th Cir. 1973), the Fifth Circuit held that "any filling of navigable waters creates an obstruction to navigation." When the same party came before the Fifth Circuit again, the court held that to trigger the permit requirements of the third clause of section 10, a party need only prove

factual circumstances showing some effect upon navigable waters, some alteration or modification of either course, loca-

tion, condition or capacity of those waters. These statutory terms are broad and undefined. So long as activities fall within this generous scope, those activities are subject to the jurisdiction of the Corps.

*United States v. Joseph G. Moretti, Inc. (Moretti II),* 526 F.2d 1306, 1309 (5th Cir. 1976);[25] *accord, Weiszmann v. District Engineer, United States Army Corps of Engineers,* 526 F.2d 1302, 1305 (5th Cir. 1976); *United States v. Sexton Cove Estates, Inc.,* 526 F.2d 1293, 1296–99 (5th Cir. 1976).

The state appellants and intervenors, however, present another argument in support of their interpretation of section 10. They argue that Congress has left to the states the regulation of water rights, including direct water supply diversions, and that

> [t]o a large extent Congress has chosen to subordinate navigation uses to those diversions. Consequently application of Section 10 of the 1899 Act to State authorized water supply diversions requires a substantially greater demonstration of tangible interference with navigable capacity, than does application of Section 10 to structures, fills, or sewage dilution diversion activities that do not relate to public water supply.

Intervenors' Brief, *supra* note 24, at 46. *See also* State Opening Brief, *supra* note 22, at 14–20. To support their argument, those parties cite various congressional enactments, primarily in the area of reclamation, which contain generalized statements announcing a congressional policy of federal noninterference in state water laws and rights.[26]

The case authority interpreting the reclamation statutes makes it clear to us that a principal purpose of such reference to state law "is to leave to state law the *definition* of the property interests, if any, for which *compensation* must be made" when these state or private rights and interests are acquired by eminent domain. *City of Fresno v. California,* 372 U.S. 627, 629–30, 83 S.Ct. 996, 998, 10 L.Ed.2d 28 (1963) (emphasis added). The Supreme Court, analyzing the effect on the California Central Valley Project of broad language recognizing state water rights in section 8 of the Reclamation Act of 1902,[27] explained:

> [I]t merely requires the United States to comply with state law when, in the construction and operation of a reclamation project, it becomes necessary for it to acquire water rights or vested interests therein. But the acquisition of water rights must not be confused with the operation of federal projects. As the Court said in [*State of*] *Nebraska v.* [*State of*] *Wyoming,* supra [325 U.S. 589,

---

**25.** Apparently, under *Moretti II* a persuasive showing of "damaging ecological effects upon navigable waters" suffices to establish an alteration or modification in the condition and capacity of waters violating section 10, clause 3. *Id.* at 1310. Because of our conclusion and the specific issues that are before us, we express no opinion as to the extent to which ecological considerations may trigger the need for a permit under section 10.

**26.** In the appendix to their brief, the intervenors set out excerpts from 37 statutes containing references to congressional recognition of state water rights, particularly in the area of state-authorized water diversions for irrigation or consumption purposes. Typical of these statements is one found in section 8 of the Reclamation Act of June 17, 1902, 43 U.S.C. § 383 (1970), which provides that nothing in that Act

> shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of such sections, shall proceed in conformity with such laws, and nothing in such sections shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof.

Other representative statutes cited by the intervenors include the Flood Control Act of 1944, 33 U.S.C. § 701–1(b) (1970); the Water Supply Act of 1958, 43 U.S.C. § 390b(a) (1970); and the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. §§ 1251(b), 1370 (Supp. V 1975).

**27.** 43 U.S.C. § 383 (1970), *quoted at* note 26 *supra.*

615, 65 S.Ct. 1332, 89 L.Ed. 1815 (1945)]: "We do not suggest that where Congress has provided a system of regulation for federal projects it must give way before an inconsistent state system."

*Ivanhoe Irrigation Dist. v. McCracken,* 357 U.S. 275, 291, 78 S.Ct. 1174, 1183–1184, 2 L.Ed.2d 1313 (1958). Similarly, in *United States v. Gerlach Live Stock Co.,* 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950), the Supreme Court specifically held that section 8 of the 1902 Act reflected a congressional intent, for the purposes of the Act, not to take water rights without compensation under the navigational servitude. *Id.* at 737–39, 70 S.Ct. 955.

As the Court has recently indicated, just last Term, the general restriction on federal action embodied in section 10 is that the Secretary of the Interior must "appropriate, purchase, or condemn necessary water rights in strict conformity with state law." *California v. United States,* 438 U.S. 645, 665, 98 S.Ct. 2985, 2996, 57 L.Ed.2d 1018 (1978). In that case, the Court, correcting some confusion concerning the scope of section 8 engendered by its prior opinions, ruled that the recognition of state law mandated by section 8 is not limited to situations in which the United States acquires water rights:

> Section 8 cannot be read to require the Secretary to comply with state law only when it becomes necessary to purchase·or condemn vested water rights. That section does, of course, provide for the protection of vested water rights, but it also requires the Secretary to comply with state law in the "control, appropriation, use, or distribution of water."

438 U.S. at 674–75, 98 S.Ct. at 3001. Therefore, the State of California was permitted to impose any conditions on the United States Bureau of Reclamation's appropriation of water from the Central Valley Project.that did not conflict with clear congressional directives authorizing the project. Mr. Justice Rehnquist, writing for the majority, emphasized that state water law governs federal operation of reclamation projects only to the extent that Con-

gress has chosen not to legislate otherwise. The Court reaffirmed the validity of the basic holdings of *Ivanhoe, supra,* 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313, and *Fresno, supra,* 372 U.S. 627, 83 S.Ct. 996, 10 L.Ed.2d 28, i. e., that specific congressional directives concerning reclamation override state law to the extent that there is a conflict between the two bodies of authority. 438 U.S. at 670–72, 98 S.Ct. at 2999; *see id.* at 670 n.23, 671 n.24, 98 S.Ct. 2985.

Section 8 of the 1902 Reclamation Act and the other statutory provisions for federal deference to state water rights do not lend support to the novel suggestion made by the appellants despite the new vitality given those provisions by *California v. United States.* The congressional policy of compliance with state law for the appropriation, purchase, condemnation, and distribution of water rights, in the absence of express congressional provision to the contrary, cannot be lifted from the context of *reclamation* so as to encroach upon the express provisions of the Rivers and Harbors Act, a statute directly concerned with obstructions to and modifications of navigable waters, enacted under the congressional power over commerce and *navigation. Cf. Gerlach, supra,* 339 U.S. at 731–42, 70 S.Ct. 955.

The Rivers and Harbors Act, of course, does not itself mention noninterference with state-authorized water supply diversion operations. The appellants point to no authority supporting their interpretation of section 10, under which the Act assertedly is to be applied differently in situations in which a state has authorized water diversions. In *United States v. Rio Grande Dam & Irrigation Co.,* 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136 (1899), a case upon which the appellants attach some reliance, the Supreme Court clearly recognized that the federal authority over navigable waters delegated by Congress to the Corps under the Rivers and Harbors Act of 1890, the predecessor of the 1899 Act, overrides any state power to authorize a water diversion project that would adversely affect navigation. The power of states over waters within their dominions, the Court held

is limited by the superior power of the General Government to secure the uninterrupted navigability of all navigable streams within the limits of the United States. In other words, the jurisdiction of the General Government over interstate commerce and its natural highways vests in that Government the right to take all needed measures to preserve the navigability of the navigable water courses of the country even against any state action.

174 U.S. at 703, 19 S.Ct. at 775. The Court observed that prior to 1890 Congress, through legislation, "recognized and assented to the appropriation of water" by states and private entities organized under state law, but ruled that the Rivers and Harbors Act controlled the issue insofar as any conflict existed. Referring to the 1890 Act, the Court wrote:

[I]t is obvious that Congress meant that thereafter no State should interfere with the navigability of a stream without the condition of national assent. It did not, of course, disturb any of the provisions of prior statutes in respect to the mere appropriation of water of *nonnavigable* streams in disregard of the old common-law rule of continuous flow, and its only purpose, as is obvious, was to affirm that as to *navigable waters nothing should be done to obstruct their navigability without the assent of the National Government.* It was an exercise by Congress of the power, oftentimes declared by this court to belong to it, of national control over navigable streams . . . . *The language is general, and must be given full scope.* It is not a prohibition of any obstruction to the navigation, but any obstruction to the navigable capacity, and *anything, wherever done or however done,* within the limits of the jurisdiction of the United States *which tends to destroy the navigable capacity* of one of the navigable waters of the United States, is within the terms of the prohibition.

28. The Court, in *United States v. Rio Grande Dam & Irrigation Co.,* 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136 (1899), illustrated this proposition of overriding federal supremacy in the area of navigation with an example:

174 U.S. at 708, 19 S.Ct. at 777 (emphasis added).

In *Sanitary District v. United States, supra,* 266 U.S. 405, 45 S.Ct. 176, 69 L.Ed. 352, the Supreme Court specifically dealt with state diversions of water for public health purposes, describing as plenary the power of Congress to remove what it identifies as obstructions to interstate and foreign commerce.

This is not a controversy between equals. The United States is asserting its sovereign power to regulate commerce and to control the navigable waters within its jurisdiction.

\*　　\*　　\*　　\*　　\*　　\*

The main ground is the authority of the United States to remove obstructions to interstate and foreign commerce. *There is no question that this power is superior to that of the States to provide for the welfare or necessities of their inhabitants.* In matters where the States may act the action of Congress overrides what they have done. . . . But in matters where the national importance is imminent and direct even where Congress has been silent the States may not act at all.

266 U.S. at 425–26, 45 S.Ct. at 178–179 (emphasis added).

While states undeniably possess broad power to regulate their own navigable waters for the general welfare, the power clearly is, and should be subordinate to the federal navigational power unless Congress expressly defers to the state authority in the context of a specific statute. Since Congress did not so defer to state authority in the case of the Rivers and Harbors Act of 1899, the State of California's powers over navigable waters cannot narrow the authority of the Corps over navigable waters as applied to state water diversions.[28]

The Hudson River runs within the limits of the State of New York. It is a navigable stream, and a part of the navigable waters of the United States, so far at least as from Albany southward. One of the streams

In sum, we hold that the lowering of water levels, as established in this case, amounts to an alteration or modification of the condition or capacity of Delta waters under clause 3 of section 10, and thus requires authorization by the Corps. This result follows without regard to the effect of the pumping plants on actual navigable capacity because a prior finding of obstruction to navigable capacity is not necessary in order to trigger the effect of clauses 2 and 3 of section 10. The federal authority set forth in the Rivers and Harbors Act of 1899 reigns paramount. Congressional deference to traditional state regulation of water rights, a consideration of significance in other contexts, does not operate to restrict the express policy of section 10.

## V. AUTHORIZATION

Having determined that the construction and operation of the Tracy and Delta Plants require the approval of the Corps under section 10, the District Court then ruled that both facilities lacked the required authorization. The respective appellants offer different arguments in respect to the Tracy Pumping Plant, a federal facility, and the California's Delta Pumping Plant. The federal appellants contend that various con-

gressional acts affirmatively authorized the Tracy Plant under section 10, clause 1. The state appellants maintain that various section 10 permits issued over the years for certain components of the Delta Plant constitute authorization for the entire Delta Plant. In addition, the state appellants urge that a Federal Power Commission. license for portions of the California Water Project eliminated any need to obtain section 10 approval. Other contentions made by the appellants in the District Court are not pressed on this appeal. We first consider the question of congressional authorization of the Tracy Pumping Plant.

### A. *Congressional Authorization of the Tracy Pumping Plant.*

The trial court found no congressional authorization of the Tracy Pumping Plant. It based its decision on the legal conclusion that "[t]he initial authorization to create an obstruction must rest on express and not implied Congressional authority. . . . The approval or funding of a facility does not compromise Congress's right to control its operation." 400 F.Supp. at 637 (*citing Sanitary District v. United States, supra,* 266 U.S. at 428, 45 S.Ct. 176, and *Hubbard v. Fort,* 188 F. 987, 996 (C.C.D.N.J.1911).[29]

which flows into it and contributes to the volume of its waters is the Croton River, a nonnavigable stream. Its waters are taken by the State of New York for domestic uses in the city of New York. Unquestionably the State of New York has a right to appropriate it waters, and the United States may not question such appropriation, unless thereby the navigability of the Hudson be disturbed. On the other hand, if the State of New York should, even at a place above the limits of navigability, by appropriation for any domestic purposes, diminish the volume of waters, which, flowing into the Hudson, make it a navigable stream, to such an extent as to destroy its navigability, undoubtedly the jurisdiction of the National Government would arise and its power to restrain such appropriation be unquestioned . . . .
174 U.S. at 709, 19 S.Ct. at 777.

**29.** The District Court principally relied upon the following statement from *Sanitary District*:
The act [of March 2, 1827, ch. 51, 4 Stat. 234] granted land to Illinois in aid of a canal to be

opened by the State for the purpose of uniting the waters of the Illinois River with those of Lake Michigan, but if it has any bearing on the present case it certainly vested no irrevocable discretion in the State with regard to the amount of water to be withdrawn from the Lake. It said nothing on that subject. We repeat that we assume that the United States desires to see the canal maintained and therefore pass by as immaterial all evidence of its having fostered the work. *Even if it had approved the very size and shape of the channel by act of Congress it would not have compromised its right to control the amount of water to be drawn from Lake Michigan.* It seems that a less amount than now passes through the canal would suffice for the connection which the United States has wished to establish and maintain.
266 U.S. at 427‑28, 45 S.Ct. at 179 (emphasis added). Applying what it perceived to be the Supreme Court rule, the District Court held:
In the instant case none of the acts in question either contain sufficiently explicit lan-

■ The rationale of the District Court sweeps too broadly. In our view, congressional approval or authorization may be found in virtually any type of statute, including appropriations statutes, so long as it is demonstrated that Congress had knowledge of the precise action or project at issue and was explicitly and specifically addressing that project. *United States v. Arizona*, 295 U.S. 174, 55 S.Ct. 666, 79 L.Ed. 1371 (1935), casts light upon the principle. There, the Supreme Court held that the Parker Dam, which the United States planned to build in the Colorado River between Arizona and California, was not authorized by any congressional act, as required by the Rivers and Harbors Act of 1899. The Government, contending that Congress had approved the dam, cited a 1904 Act authorizing the diversion of Colorado River waters for the purpose of irrigating adjoining lands on Indian reservations. *Id.* at 185, 55 S.Ct. 666. In support of its construction, the Government asserted that under the 1904 Act another structure, the Laguna Dam, had previously been built across the Colorado.

Rejecting the Government's argument, the Supreme Court pointed out that "Congress has made appropriations for the benefit of the project of which it [the Laguna Dam] is a part and so recognized and approved the building of the dam," citing Acts of 1916, 1917, and 1918 making appropriations for the Yuma Project, Arizona-California, which includes the Laguna Dam. *Id.* at 186 n.5, 55 S.Ct. 666. As to the Parker Dam, however, the Court refused to hold that Congress had authorized the project under the 1904 Act "by making appropriations for irrigation of lands in Indian reservations." *Id.* Unlike the situation in our case, the 1904 Act did not specifically address the project at issue. *Compare* Rivers and Harbors Act of 1937, ch. 832, 50 Stat. 844, 850, *quoted* at n.31 *infra*, with Act of Apr. 21, 1904, § 25, 33 Stat. 224.

■ *United States v. Arizona, supra*, teaches that Congress, while it may authorize a project by means of general appropriations legislation, must have known and intended that the specific facility in question was a part of the project for which it

guage or are accompanied by a legislative history clearly manifesting approval of the facilities for the purpose of Section 10. *For the most part* these acts do not even refer specifically to the pumping plant but rather are very general approvals of the Central Valley Project or the San Luis unit. *All Congress did was authorize the construction of those projects and appropriate funds for them.* Congress did not, however, agree to relinquish its Section 10 responsibilities or exercise this power in any respect. *Even if Congress had gone so far as specifically to fund the construction of the Tracy Plant precisely as it stands today, this fact would not constitute authorization to operate it, as before operation occurred, either Congress or the Corps of Engineers would have to consider within what Section 10 parameters the Tracy Plant could operate and issue an appropriate authorization.*
400 F.Supp. at 637–38 (emphasis added).

In the quoted passage from *Sanitary District*, the Supreme Court strictly construed the actions of the United States as to the diversion of Lake Michigan waters. In that case the federal government had brought suit to enjoin the Sanitary District of Chicago from diverting water from the lake in excess of a specified amount. The District had defended on the basis of estoppel, arguing that "the United States has given

its assent to all that has been done and . . . it is estopped to take the position" that the diversions constituted obstructions to navigable capacity. 266 U.S. at 427, 45 S.Ct. at 179. It was, therefore, in the context of considering an argument of estoppel against the Government that Mr. Justice Holmes stated that the "strict construction of the Government's act" avoided the defendant's contention: *Id.* Accordingly, the import of *Sanitary District* is not that Congress must affirmatively authorize *both* construction *and* operation of a diversion project for it to be legal under section 10, as the District Court supposed. Instead, the Supreme Court simply stated that Congress is *not precluded* from setting limits on the amount of a water diversion even if it has previously authorized the specific project. An analogue in the instant case would arise if the federal government itself were actively seeking to restrict the amount of water diverted by the Tracy Plant. None contends that it could not do that, if it so chose. The right of the Congress to control the operation of a facility that it has previously approved, however, is not at issue here. In short, we cannot accept the proposition that *Sanitary District* supports the finding that section 10 requires separate approval by either Congress or the Corps for both the construction and the operation of a water diversion project.

was making appropriations. This interpretation is supported by other cases holding that Congress may authorize activities by means of appropriations legislation that specifically and directly relates to the projects in question.[30] We also note that the Corps' administrative regulations governing issuance of permits are consistent with this principle:

> The general legislation by which Federal agencies are empowered to act generally is not considered to be sufficient authorization by Congress to satisfy the purposes of Section 10. If an agency asserts that it has Congressional authorization meeting the test of Section 10 or would otherwise be exempt from the provisions of Section 10, *the legislative history and/or provisions of the Act should clearly demonstrate that Congress was approving the exact location and plans from which Congress could have considered the effect on navigable waters* of the United States or that Congress intended to exempt that agency from the requirements of Section 10.

33 C.F.R. § 322.3(c)(1) (1978) (emphasis added). Generally, a court should accord great weight to the construction of a statute by the agency responsible for its administration. *E. g., California v. United States, supra,* 438 U.S. at 676 n.30, 98 S.Ct. 2985; *Zemel v. Rusk,* 381 U.S. 1, 11, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

The question thus narrows itself to whether the various congressional statutes and legislative history concerning the Central Valley Project are so sufficiently specific as to the Tracy Pumping Plant as to constitute congressional authorization under section 10. In our view, the basic enactments authorizing the Central Valley Project in 1937 and the annual appropriations acts for operation and maintenance of the Central Valley Project, when read in light of the legislative history of the broad oversight exercised by the Congress over the project, constitute affirmative authorization of the Tracy Plant.

The Rivers and Harbors Act of 1937, ch. 832, § 2, 50 Stat. 844, 850, reauthorized the entire Central Valley Project, theretofore authorized and established under the Emergency Relief Appropriation Act of 1935, 49 Stat. 115.[31] As of 1937, then, Congress had

---

**30.** *See United States v. Dickerson,* 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940) (Congress could suspend certain military re-enlistment allowances, provided for by prior legislation, by means of an amendment to an appropriations bill); *Wisconsin v. Duluth,* 96 U.S. 379, 382–88, 24 L.Ed. 668 (1878) (by means of an appropriation, Congress had "adopted, recognized, and taken charge of" a project previously initiated privately without congressional authorization); *Friends of the Earth v. Armstrong,* 485 F.2d 1, 9–10 (10th Cir. 1973) (en banc) (Congress can, by an appropriations act, suspend or modify a prior act concerning the spreading of waters impounded in Lake Powell into Rainbow Bridge National Monument), *cert. denied,* 414 U.S. 1171, 94 S.Ct. 933, 39 L.Ed.2d 120 (1974); *United States v. Kennedy,* 278 F.2d 121, 122–23, 126 (9th Cir. 1960) (General Appropriation Act of 1951, Act of Sept. 6, 1950, 64 Stat. 595, appropriating funds for the National Park Service, provided necessary statutory authorization for taking of land within boundaries of Mount McKinley National Park); *cf. City of Santa Clara v. Andrus,* 572 F.2d 660, 672 (9th Cir.), *cert. denied,* 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978) (to show congressional ratification of an electrical power allocation scheme by appropriation of money, "the government must sustain the heavy burden of demonstrating Congressional knowledge of the precise course of action alleged to have been acquiesced in").

**31.** The Rivers and Harbors Act of 1937 declared the Central Valley Project

> to be for the purposes of improving navigation, regulating the flow of the San Joaquin River and the Sacramento River, controlling floods, *providing for storage and for the delivery of the stored waters thereof,* for the reclamation of arid and semiarid lands and lands of Indian reservations, and other beneficial uses, and for the generation and sale of electric energy as a means of financially aiding and assisting such undertakings and in order to permit the full utilization of the works constructed to accomplish the aforesaid purposes: *Provided further,* That, except as herein otherwise specifically provided the provisions of the reclamation law, as amended, shall govern the repayment of expenditures and the construction, operation, and maintenance of the dams, canals, power plants, *pumping plants,* transmission lines, and identical works *deemed necessary to said entire project,* and the Secretary of the Interi-

clearly authorized the Central Valley Project, the general plans of which contemplated a large-scale diversion of water from the Delta to the San Joaquin Valley. Subsequently, Congress enacted the Reclamation Project Act of 1939, ch. 418, 53 Stat. 1187 (codified at 43 U.S.C. §§ 375a, 387–389, 485–485h, 485i–485k (1970)). Section 9(a) of the Act, 43 U.S.C. § 485h(a) (1970), provides that federal reclamation projects were to become automatically authorized when the Secretary of the Interior found them to be feasible and submitted a favorable report to the President and to the Congress.[32] On February 24, 1947, the Secretary of the Interior forwarded to Congress a Finding of Feasibility pursuant to the 1939 Reclamation Act. H.R. Doc. No. 146, 80th Cong., 1st Sess. (1947), *reprinted in* Engle, *Central Valley Project Documents*, H.R. Doc. No. 416, 84th Cong., 2d Sess., pt. 1, at 574 (1956). The feasibility report contained a detailed discussion of the Delta-Mendota Canal, the 115-mile canal connecting the Mendota Pool in the San Joaquin Valley with the Tracy Pumping Plant. The initial contract for

construction of the Delta-Mendota Canal was dated June 14, 1946, and the canal's construction was completed prior to July 1, 1952. The initial construction contract for the Tracy Pumping Plant was made on June 23, 1947, with construction of the Plant completed prior to February 1, 1953.

Over the years Congress has repeatedly appropriated funds for the Tracy facilities. These appropriations acts have generally lumped together funds for the Central Valley Project as a whole. As such, the situation appears to come within the dictum of *United States v. Arizona* that "Congress has made appropriations for the benefit of the project of which it is a part and so *recognized and approved* the building" of the project under the Rivers and Harbors Act of 1899. *United States v. Arizona, supra,* 295 U.S. at 186, 55 S.Ct. 666, at 670 (emphasis added).[33] It is manifest from the legislative history that Congress was well aware of the Tracy Pumping Plant as part of the Central Valley Project, fully approved of it, and consistently encouraged its construction and operation.[34]

or may enter into repayment contracts, and other necessary contracts, with State agencies, authorities, associations, persons, and corporations, either public or private, including all agencies with which contracts are authorized under the reclamation law . . ..

Rivers and Harbors Act of 1937, ch. 832, § 2, 50 Stat. 844, 850.

**32.** Section 485h(a) reads, in pertinent part, as follows:

If the proposed construction is found by the Secretary to have engineering feasibility and if the repayable and returnable allocations to irrigation, power, and municipal water supply . . . ., together with any allocation to flood control or navigation . . . ., equal the total estimated cost of construction as determined by the Secretary, then the *new project, new division of a project, or supplemental works on a project, covered by his findings, shall be deemed authorized and may be undertaken by the Secretary.* If all such allocations do not equal said total estimated cost, the said new project, new division, or new supplemental works may be undertaken by the Secretary only after provision therefor has been made by Act of Congress . . . . .

43 U.S.C. § 485h(a) (1970) (emphasis added).

**33.** Moreover, the First Deficiency Appropriation Act of 1946, ch. 589, 59 Stat. 632, 647–48

(1945), contained an appropriation "for construction of the . . . Delta division, Delta-Mendota canal, $7,500,000," and the Interior Department Appropriation Act of 1949, ch. 754, 62 Stat. 1112, 1129 (1948), contained a specific appropriation for the Tracy Pumping Plant Switchyard.

**34.** The legislative history of congressional authorization of and appropriations for the Central Valley Project is fully covered in Engle, *Central Valley Project Documents*, H.R. Doc. No.416, 84th Cong., 2nd Sess., pt. 1 (1956), and H.R.Doc.No.246, 85th Cong., 1st Sess. (1957).

A 1946 House report stated that funds were to be provided for transmission lines to bring "power to the Delta area *where it will be required for the pumping of water for* irrigation and water supply purposes. The sum recommended would provide funds to begin construction of this line, extending from Oroville to Tracy." H.R.Rep.No.1288 on H.R.4805, 79th Cong., 1st Sess. (1946), *reprinted in* Engle, *supra,* pt. 2, at 21 (emphasis added). Again, in 1947, an appropriation was made for completion of the power transmission line, "which will ultimately be extended to Tracy to provide power for pumping water in the Delta area. . . . ." *Id., reprinted in* Engle, *supra,* pt. 2, at 22–23. In 1949 the following statement appears in H.R.Rep.No.2038, 80th Cong., 2d Sess.

In 1960 Congress authorized the construction of the San Luis Unit of the Central Valley Project. Act of June 3, 1960, Pub.L. No.86–488, 74 Stat. 156. In section 4 of the Act Congress expressly noted the precise location and plans of the Tracy Pumping Plant as a critical and integral part of the San Luis Unit project.[35] There is no evidence whatsoever that Congress intended to authorize the San Luis Unit if, and only if, the Corps of Engineers subsequently issued a section 10 permit on its own for either the construction or operation of the Tracy

Plant. The District Court distinguished the 1960 Act on the ground that it was enacted after the commencement of the operation of the Tracy Plant, "and hence even if it were intended as Congressional consent, the original construction and operation of the Tracy Plant were unlawful." 400 F.Supp. at 637 n.41. We disagree. In *Wisconsin v. Duluth,* 96 U.S. 379, 24 L.Ed. 668 (1878), the Supreme Court upheld congressional authorization of a previously inaugurated private project on the basis of an appropriations act. The Court reasoned that it would un-

(1948), *reprinted in* Engle, *supra,* pt. 2, at 27–28:

> The drought which large areas in California have experienced this past winter reemphasizes the necessity for expediting the construction of the irrigation facilities of the Central Valley project. To this end the committee has made liberal appropriations for storage and irrigation facilities. It has also provided all funds necessary to continue construction of the powerplants and switchyards at Shasta and Keswick Dams, the Oroville-Tracy transmission line and the switchyard at the Tracy pumps on the Delta-Mendota canal. . . . None of the funds in the bill and no funds heretofore provided for switchyards are to be used for the construction . . . of any switchyard facilities at Tracy not required for the operation of the project pumps
> . . . .

*See* Act of June 29, 1948, ch. 754, 62 Stat. 1112, 1128–29. The Senate report discussing the same bill stated:

> The committee recognizes that the Central Valley project has since its inception contemplated the construction of transmission lines done [sic] the West side of the Sacramento River as well as down the East side from Shasta Dam to the Tracy pumping plant, which lines are an integral part of this multiple-purpose project.

S.Rep.No.1609, 80th Cong., 2d Sess. (1948), *reprinted in* Engle, *supra,* pt. 2, at 28. In 1952 Commissioner of Reclamation Michael W. Straus testified at Senate hearings on the Central Valley Project appropriations bill for that year:

> I want to report particularly on the Central Valley project of California *that this committee has protected and financed* since Reclamation was given the job of making California's half-century dream come true. . . .
>
> The California Legislature has declared August 1 to August 10 a Central Valley Project Festival. The reason for these dates is that our multiple-year, multiple-purpose job of completing the original authorized project is virtually complete. On August 1 water will be released from Shasta Dam, carried down

> the Sacramento River through Shasta and Keswick generators, through the cross-channel-canal cut, *lifted up 200 feet by the great Tracy pumps,* sloshed down the long Delta-Mendota Canal to the Mendota pool, where it will be exchanged for water trapped by Friant Dam in the San Joaquin River, and carried 158 miles down the Friant-Kern Canal to Bakersfield.
>
> That is an overall total movement of water 500 miles—the farthest that man has moved water anywhere at any time. *That is a culmination of the work this committee has supported over the years.*
>
> It will be a period of rejoicing the whole length of the California Valley. It is my hope that the members of this committee *who protected and nursed the project into being* can accept some of the multiple invitations I know they are going to receive to see *the attainment of the committee's objective.*

Engle, *supra,* pt. 2, at 37 (emphasis added). Further references to the Tracy Pumping Plant and specific appropriations therefor as an integral part of the Central Valley Project abound in the legislative history. *E. g., id.* at 21–28, 32–38, 40–44, 49, 50–51, 60, 65, 305.

**35.** Section 4 of this Act provides, in pertinent part:

> If the Secretary proceeds to construct, operate, and maintain the San Luis Works under the terms of section 1 of this Act solely as a Federal project, the operation shall be subject to the following restriction: Whenever the chlorides in the water at the head of the Delta-Mendota Canal exceed one hundred and fifty parts per million during the months of July, August, or September, *the mean daily diversion from the Sacramento-San Joaquin Delta to San Luis unit via Tracy pumping plant and Delta-Mendota Canal* as measured at the San Luis pumping plant shall not exceed the mean daily import to the Sacramento Valley from the Trinity project.

Act of June 3, 1960, Pub.L.No.86–488, § 4, 74 Stat. 156, 159 (emphasis added).

reasonably restrict Congress' power to hold that Congress could not retroactively approve previously unauthorized projects.

We are therefore constrained to hold that the statutes and legislative history sufficiently demonstrate congressional approval of the Tracy Pumping Plant and its operation, both at the initiation of the Central Valley Project and, retroactively, after the completion of the plant.[36]

### B. *Corps Authorization of the Delta Pumping Plant*

In the District Court the state appellants contended that various section 10 permits issued with respect to components of the Delta Pumping Plant constituted Corps authorization of the plant itself. Here, they limit their argument to Permit No. 4101, issued in June 1967, which authorized the construction of the Clifton Court Forebay. This forebay, a reservoir between the Delta and the pumping plant, was designed to allow the pumping to be confined to off-peak electrical hours. Its only function is to serve as an intake facility for the Delta Pumping Plant.

Plainly, the permit does not authorize the entire Delta Pumping Plant. No direct evidence in the permit file refers to the pumping plant, and the permit itself only authorized the State "to cut the westerly levee, of West Canal, at Clifton Court Tract for Clifton Court Forebay in Contra Costa County, California." Nor can we construe the permit as implicit authorization for the Delta Plant. The Corps regulations required that a permit application be complete and without reference to any unattached correspondence. 33 C.F.R. § 209.-130(b)(6) (1967). Maps and plans showing the location, extent, and character of the project were considered essential, and the proposed work was to be indicated in red ink. 33 C.F.R. §§ 209.130(c)(1), (c)(11) (1967). Given the completeness required of the application and the absence of any mention of the Delta Plant therein, we cannot appropriately say that the permit implicitly authorized more than the approved application upon which it was based.[37]

---

**36.** After the first draft of a proposed Opinion in the present appeal was circulated for the consideration of Judges Trask and Tang, our court issued its decision in *Libby Rod and Gun Club v. Poteat,* 594 F.2d 742 (9th Cir. 1979). Initially, *Libby* was the cause of concern on the part of the author of this Opinion, especially in respect to our conclusion that Congress had impliedly authorized the Tracy Pumping Plant. Certain broad language in *Libby* appeared to declare that, henceforth, the affirmative congressional authorization specifically required by the Rivers and Harbors Act for obstructions to navigable capacity of waters could not be conferred by appropriations bills alone, however, specific such an appropriation act may have been toward a particular project it was funding. *See* 594 F.2d at 746, especially notes 5 and 6, and Judge Kennedy's dissenting opinion at 748–753. This concern, however, has been laid to rest by the concurring opinion of Judge Tang, who was one of the two judges constituting the majority in *Libby. See* pages 607 to 609, *infra.*

**37.** Even if it could be said that Permit No. 4101 initially authorized the operation of the Delta Pumping Plant, the Corps yet retains the power to impose conditions upon the continuing pumping operation. As the state appellants concede, paragraph (f) of Permit No. 4101 provides, in respect to the authorized activity, that "if, in the opinion of the Secretary of the Army,

it shall cause unreasonable obstruction to the free navigation of said water, the owner will be required . . . to remove or alter the structural work or obstructions caused thereby. . . ." Moreover, under the Corps' present regulations,

[t]he District Engineer may reevaluate the circumstance and conditions of a permit either on his own motion or as a result of periodic progress inspection, and *initiate action to modify, suspend or revoke a permit as may be made necessary by consideration of the general public interest.* . . . Significant increases in scope of a permitted activity will be processed as new applications for permits in accordance with section 325.2, and not as modifications under this paragraph. 33 C.F.R. 325.7(a) (1978) (emphasis added). Thus, even if no further authorization is required to justify the continued existence of the Delta Pumping Plant because of the Corps' prior acquiescence in the plant's operations, the State is not relieved from section 10 permit requirements. Although the prior acquiescence by the Corps may establish a basis for estoppel against a Corps request to abolish the Delta Pumping Plant altogether, the operations of the plant remain subject to present regulations of the Corps. *See Sanitary Dist. v. United States,* 266 U.S. 405, 427–28, 45 S.Ct. 176, 69 L.Ed. 352 (1925); *cf. United States v. Sunset*

The state appellants also contend that a Federal Power Commission (FPC) license for portions of the California Water Project eliminated the need for a section 10 permit. Had the FPC granted a license covering the Delta Pumping Plant, their position would have some support. *See Scenic Hudson Preservation Conference v. Callaway,* 370 F.Supp. 162, 164–68 (S.D.N.Y.1973), *aff'd,* 499 F.2d 127 (2d Cir. 1974). But the FPC did not license the Delta Pumping Plant. Instead, it expressly and specifically declined to "extend our jurisdiction beyond those facilities actually constructed for power purposes so as to include hundreds of miles of canals, pumping stations and other associated facilities unrelated to the production of power." Department of Water Resources of the State of California, 51 F.P.C. 529, 533 (1974).

The Corps of Engineers has promulgated regulations to govern situations in which its jurisdiction overlaps with that of the FPC. When a project is subject to FPC regulation, the Corps fulfills its duty of protecting navigable waters by recommending to the FPC the inclusion of appropriate provisions rather than by directly issuing a Corps permit; however, "as to any other activities in navigable waters not constituting construction, operation and maintenance of physical structures licensed by the FPC . . . the provisions of 33 U.S.C. § 401 et seq. remain fully applicable." 33 C.F.R. § 320.-3(f) (1978).

The FPC agrees that its license does not necessarily extend to all facilities of a project. In its opinion concerning the California Water Project, the FPC cautioned that "[t]he mere fact that various facilities are proposed for licensing by an applicant is not sufficient reason to assume that all such facilities are properly the subject of a license." The FPC also said, "[W]hen a particular facility is no longer part of the power project itself, it is not subject to our licensing jurisdiction." Department of

Water Resources of the State of California, 51 F.P.C. 529, 533 (1974).

Thus, both the Corps and the FPC have said that the State should apply to the Corps for a permit for construction of a water transportation facility unrelated to power production. Their construction of the interrelationship between the Federal Power Act and the Rivers and Harbors Act is entitled to much deference, and we will follow it here. *See Chemehuevi Tribe of Indians v. FPC,* 420 U.S. 395, 409–10, 95 S.Ct. 1066, 43 L.Ed.2d 279 (1975).

Although we reject the contentions of the state appellants as to the effect of Permit No. 4101 and the FPC license, it is conceivable that the State may still be excused from obtaining a permit for the operation of the Delta Pumping Plant. Present regulations of the Corps of Engineers contain a grandfather clause that dispenses with the need to obtain individual section 10 authorization for certain structures. The regulation provides, in pertinent part:

The following structures or work are hereby permitted for purposes of Section 10 and do not require separate Department of the Army permits:

\* \* \* \* \* \*

(g) Structures or work completed before 18 December 1968 or in water-bodies over which the District Engineer has not asserted jurisdiction *provided* there is no interference with navigation.

33 C.F.R. § 332.4(g) (1978) (emphasis added).[38] The District Court found that

[c]onstruction commenced on the Delta Pumping Plant . . . in July of 1963 and was sufficiently completed by late 1967 so that the Delta Plant could begin diverting Delta water at that time. It was not until February of 1969, however, that all construction was finished.

400 F.Supp. at 620–21.

Because the record on appeal does not reflect whether the pumping plant it-

increase in the pumping must have received Corps authorization.

**38.** The superseded regulation, 33 C.F.R. 209.-120(g)(12)(vii) (1977), was similar.

self was completed prior to December 18, 1968, and the parties have not yet addressed the question, this question should first be considered by the District Court. At this time we express no opinion as to the validity of the Corps regulation. All such arguments should be presented in the first instance to the District Court. If the District Court finds that the Delta Pumping Plant was completed prior to December 18, 1968, the above regulation will exempt the State from obtaining an individual section 10 permit, provided that the facility does not interfere with navigation and so long as the regulation may be held to be a valid exercise of the Corps' authority.

## VI. CONCLUSION

In summary, we hold that parties who suffer special injury have a private right of action to enforce compliance with the permit requirements of section 10. Sierra Club and the two individual appellees have standing to avail themselves this private right of action. We have already explained why, as to Friends of the Earth, the judgment was to be vacated and its complaint dismissed.

On the merits, the Tracy and Delta Pumping Plants fall within the ambit of section 10, since their operation has altered navigable waters of the United States. Because Congress affirmatively authorized the Tracy Pumping Plant, a Corps permit is not required for its present operational level. Therefore, we do not reach the question of

whether an environmental impact statement is required for the Tracy Plant. The Delta Pumping Plant, which has not been authorized by Congress, must obtain a Corps permit for its operation, unless exempted by the Corps regulation, 33 C.F.R. § 322.4(g) (1978).[39] To the District Court, we accord the discretion to allow the pumping to continue at its present level pending the filing and processing of the permit application. Traditional equitable principles apply. Cf. Kleppe v. Sierra Club, 427 U.S. 390, 407–08, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976); Cady v. Morton, 527 F.2d 786, 798 n.12 (9th Cir. 1975).

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

TANG, Circuit Judge, concurring:

One important aspect of this case concerns congressional authorization of the Tracy Pumping Plant. Specifically, we have concluded that Congress intended to authorize the Tracy Plant, and that the district court was in error when it concluded that the consent of Congress had not been obtained for the Plant's construction.

Our conclusion that the Tracy Pumping Plant was authorized by Congress rests in part upon our review of relevant appropriations measures which, when viewed in light of the entire record, evidence clear congressional consent to the Plant's construction and operation as mandated by Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403.

---

**39.** We vacate the District Court order that the Secretary of the Army, or his delegate, prepare an environmental impact statement prior to issuing a section 10 permit for either pumping plant. See 400 F.Supp. at 651. An environmental impact statement is not required at the present time.

It is true that, under our decisions, an environmental impact statement may be required before the Corps can lawfully issue a permit for the Delta Pumping Plant, since federal approval—be it in the form of a permit, license, or otherwise—that allows a project to proceed constitutes "a major federal action" within the meaning of section 102 of the National Environmental Policy Act, 42 U.S.C. § 4332 (1970). Cady v. Morton, 527 F.2d 786, 793 (9th Cir. 1975); Scientists' Inst. for Public Information,

Inc. v. Atomic Energy Comm'n, 156 U.S.App. D.C. 395, 404–405, 481 F.2d 1079, 1088–89 (D.C.Cir. 1973); Davis v. Morton, 469 F.2d 593, 597 (10th Cir. 1972). At this time, however, to order the preparation of an environmental impact statement for the Delta Pumping Plant would be premature. See Abbott Laboratories v. Gardner, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Under Corps regulations, the District Engineer makes the initial determination of whether an alteration or modification of navigable waters will require an environmental impact statement. 33 C.F.R. § 325.4(b) (1978). We can see no justifiable reason, in this case, to depart from what we perceive to be an orderly procedure. Not until the Corps has made its decision should a party in a case such as this seek relief in the courts.

There may be some question that our holding in this case might conflict with this court's recent decision in *Libby Rod and Gun Club v. Poteat*, 594 F.2d 742 (9th Cir. 1979). As a member of the majority in *Libby*, it is important to point out distinguishing differences between this case and *Libby*.

## I

## Authorizing Legislation

A review of the relevant authorizing legislation addressing the Tracy Pumping Plant and the Libby Dam Project highlights the distinction between the two cases.

On appeal from the district court's ruling that a reregulating dam had not been authorized as required under 33 U.S.C. § 401, the Army Corps of Engineers (Corps) argued in *Libby* that the Flood Control Act of 1950 authorized both the main Libby Dam and a reregulating dam. Upon examination of the Flood Control Act, the court concluded that the sole reference to reregulation was contained in ¶ 165 of H.R. Doc.No. 521, 81st Cong., 2d Sess. (1950) which had been incorporated in the Act. That paragraph, the court held, did not explicitly authorize a reregulating dam—to the contrary, it noted that reregulation would be considered "when the need arises." *Libby Rod and Gun Club v. Poteat*, 594 F.2d at 744. The court further concluded that this lone reference to reregulation could not be construed to authorize implicitly a reregulating dam, because: (1) it was not clear when the Flood Control Act was passed that a reregulating dam was necessary for the effective functioning of the main Libby Dam, and the Corps had cited no authority to support the proposition that a dam could be deemed authorized by necessity under 33 U.S.C. § 401; and (2) to imply authorization would frustrate the intent of Congress, evidenced in ¶ 165, to examine reregulation "when the need arises." Therefore, the court was not convinced that Congress intended to authorize a reregulating dam in the Flood Control Act.

The authorizing legislation in the instant appeal paints a different picture of congressional intent.

First, the Rivers and Harbors Act of 1937, ch. 832 § 2, 50 Stat. 844, reauthorized the entire Central Valley Project. (Opinion at 602.) In that authorization, Congress explicitly authorized, *inter alia*, pumping stations necessary to the effective functioning of that project. Rivers and Harbors Act of 1937, 50 Stat. at 850; (Opinion at 602 n.31.) Unlike *Libby* therefore the original authorizing legislation recognized the possible need for pumping stations and seemingly *authorized their construction* if they became necessary to the functioning of the entire project.

Second, the Reclamation Project Act of 1939, 43 U.S.C. § 485h(a), deemed as authorized any reclamation project that the Secretary of Interior found to be feasible, and that the Secretary had submitted a favorable report upon to the President and Congress. (Opinion at 603.) In 1947 the Secretary forwarded to the President and Congress a favorable feasibility report of the Central Valley Project, which contained a detailed analysis of the Delta-Mendota Canal, one aspect of which is the Tracy Pumping Plant. (Opinion at 603.)

Unlike the Flood Control Act in *Libby*, the Reclamation Project Act was general legislation that allowed the Secretary of Interior to approve a project and the elements thereof, and such approval by the Secretary was deemed to represent authorization of the project.

Third, the Act of June 3, 1960, Pub.L.No. 86–488, 74 Stat. 156, authorized the construction of the San Luis Unit of the Central Valley Project. (Opinion at 29.) In that legislation, Congress explicitly "noted the precise location and plans of the Tracy Pumping Plant as a critical and integral part of the San Luis Unit project." (Opinion at 604–605.)

The importance of these three facts cannot be underestimated. First, Congress recognized the necessity of pumping plants in the Rivers and Harbors Act; second, it granted the Secretary of the Interior broad authority to authorize reclamation projects;

and third, other authorization legislation specifically referred to the Tracy Pumping Plant. When these facts are examined in light of subsequent appropriations, a result different from *Libby* is mandated.

## II

### Appropriations

In *Libby*, this court was confronted by conflicting legal arguments. The Corps contended that appropriations measures should be equated automatically with project authorization. The Rod and Gun Club conversely argued under *T.V.A. v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) that appropriations could never be equated with authorization.

This court adopted a middle view, concluding that appropriations should not be regarded as measures that either automatically authorized, or failed to authorize, a given project. This view was based in part on *T.V.A. v. Hill*, where the Court held that appropriation bills and substantive enactments of Congress were distinguishable:

> We recognize that both substantive enactments and appropriations measures are "Acts of Congress," but the latter have the limited and specific purpose of providing funds for authorized programs.

*Id.* at 190, 98 S.Ct. at 2299–2300.

Importantly, the panel in *Libby* did *not* hold that *T.V.A. v. Hill* mandated that appropriations could never be regarded as representing authorization. Rather, *Libby* merely recognized that an analysis of legislative history was required before a conclusion could be made as to the effect of a given appropriations measure.[1] Although *T.V.A. v. Hill* was certainly a distinguishable case on numerous grounds, its direct recognition of the difference between appropriations measures and substantive enactments transcends the facts of that case. This point alone was relied upon in *Libby*.

The *Libby* court then proceeded to examine the facts of the case, and held that the appropriations for the reregulating dam could not be regarded as authorization. This conclusion was based on a combination of two factors: (1) the authorizing legislation not only failed to indicate that a reregulating dam was contemplated as part of the Libby Dam project, but suggested as well that an analysis of the need for a second dam would be undertaken if the need for such a dam arose; and (2) there was strong evidence in the record that the Corps had misled appropriations committees by asserting to committee members that the reregulating dam had been specifically authorized by the Flood Control Act. *Libby*, 594 F.2d at 746. Confronted with such a legislative background, the court was reluctant to hold that the appropriations represented the will of Congress and could thus be equated with the consent required under § 401.

The facts here in *Sierra Club* are decidedly different. First, the Rivers and Harbors Act of 1937 recognized that pumping stations might be necessary to the effective functioning of the Central Valley Project, and thus implicitly authorized such stations. *See Pigeon River Co. v. Cox*, 291 U.S. 138, 159–60, 54 S.Ct. 361, 78 L.Ed. 695 (1934). The funding of what Congress recognized as possible necessary aspects of a project creates a situation different than that existing in *Libby*, and the appropriations, when viewed in light of this original authorizing legislation, can be reasonably regarded as authorizing the Tracy Pumping Plant by implication.

Second, the Secretary of the Interior was given general authority to authorize specific projects under the Reclamation Project Act of 1939. When the Secretary found the Central Valley Project feasible and submitted a favorable report to Congress, spe-

---

1. *Libby* did recognize, however, that appropriations measures and the committee reports accompanying such measures are to be scrutinized closely when it is argued that such measures represent substantive authorization. This view arises from both *T.V.A. v. Hill* and *SEC v.*

*Sloan*, 436 U.S. 103, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978), where the Court has suggested that isolated remarks in committee reports and hearings are not to be regarded as necessarily representing the will of Congress as a whole.

cific appropriations for the pumping station take on a significance not found in *Libby*. Indeed, these facts place *Sierra Club* directly under this court's rulings in *United States v. Kennedy*, 278 F.2d 121, 122 (9th Cir. 1960) and *Polson Logging Co. v. United States*, 160 F.2d 712, 714 (9th Cir. 1947). In these cases, the court determined that when a government official had been given general authority to condemn land for public uses, appropriations for specific parcels could be regarded as congressional authorization to acquire that land. The facts of *Sierra Club* seem highly analogous, because the Secretary was given general authority to authorize reclamation projects. Thus, appropriations for the Tracy plant can be regarded under *Kennedy* as authorization.

Third, the recognition of the Tracy Pumping Plant in the authorizing legislation for the San Luis Unit creates a strong inference that Congress believed it had authorized the Tracy Pumping Plant, and again appropriations, when viewed in light of this fact, can reasonably be regarded as supporting the conclusion that the pumping plant had been authorized. In *Libby*, the Corps argued similarly that the Water Resources Development Act implicitly recognized the existence of the reregulating dam, because the Act authorized generators for the reregulating dam. This claim was rejected, because the Water Resources Development Act authorized design studies only. However, the *Libby* court did note that had generators been authorized for the reregulating dam, a strong inference would have arisen that Congress intended to authorize the necessary structure in which the generators were to be placed, *i. e.*, the reregulating dam.

The recognition in the San Luis Unit authorization of the Tracy Pumping Plant as a critical and integral part of the San Luis Unit project creates the "strong inference" of intent to authorize that which was lacking in *Libby*. This inference, combined with specific appropriations for the Tracy Pumping Plant, satisfies me that Congress has consented to the construction and operation of the Tracy Pumping Plant.

A final point should be made. Both the majority in this case and Judge Kennedy in his dissent in *Libby* rely heavily upon *United States v. Arizona*, 295 U.S. 174, 55 S.Ct. 666, 79 L.Ed. 1371 (1935) and *Wisconsin v. Duluth*, 96 U.S. 379, 24 L.Ed. 668 (1877) for the proposition that appropriations should be equated with authorization.

I do not read either *United States v. Arizona* or *Wisconsin v. Duluth* as necessarily controlling. Both cases predate *T.V.A. v. Hill*, and to read either case as representing a decision by the Court that appropriations measures automatically represent authorization for purposes of the Rivers and Harbors Act of 1899 is suspect in light of that decision. However, the dictum in *United States v. Arizona* did suggest that Congress had appropriated money for a certain Laguna Dam Project "and so recognized and approved the building of the dam." *United States v. Arizona*, 295 U.S. at 186, 55 S.Ct. at 670.

It would appear unwise to me to read this dictum overly broadly. The facts in *Arizona* do not make clear the exact specifics of the Laguna Dam Project, and the Court might have been persuaded by any number of factors to conclude that the appropriations represented authorization. Because none of these factors are directly addressed in the Court's decision, the *Libby* majority thought it reasonable to distinguish the dictum and rely instead on an independent analysis of the facts of the *Libby* case.

In review, the facts of *Libby* and *Sierra Club* are distinguishable. *Libby* held that appropriations were to be analyzed closely in light of the facts of a given case. When the facts of *Sierra Club* are so analyzed, we have concluded that appropriations, when combined with the original legislation relating to the Tracy Pumping Plant, represent the consent of Congress mandated by 33 U.S.C. § 403.