678 F.Supp. 790 (1988)
MISSOURI COALITION FOR the ENVIRONMENT, et al., Plaintiffs,
v.
CORPS OF ENGINEERS OF the UNITED STATES ARMY, et al., Defendants.
No. 87-1397C(3).
United States District Court, E.D. Missouri.
January 8, 1988.
*791 James J. Wildon, Richard C. Constance, David R. Bohm, City Counselors Office, City of St. Louis, and Lewis C. Green, Green Hennings and Henry, St. Louis, Mo., for plaintiffs.
Thomas M. Carney, Maxine I. Lipeles, Husch Eppenberger Donohue, Cornfeld & Jenkins, St. Louis, Mo., for defendants Sverdrup Corp., Roverport, Inc., Riverport Associates and St. Louis County.
Jean Anne Kingrey, Sp. Litigation Counsel, Dept. of Justice, Land and Natural *792 Resources Div., Washington, D.C., Joseph B. Moore, Asst. U.S. Atty., St. Louis, Mo., for defendants.
Jean Z. Matzeder, Norman R. Spero, U.S. Army Corps of Engineers, Kansas City, Mo., for defendants U.S. Army Corps of Engineers and other Federal defendants.

MEMORANDUM
HUNGATE, District Judge.
This matter is before the Court to determine the merits of plaintiffs' claim after a five-day trial before the Court sitting without a jury.

INTRODUCTORY SUMMARY OF CLAIMS
Plaintiffs filed a complaint against several private entities, federal officials, and the Corps of Engineers of the U.S. Army ("Corps") seeking declaratory and injunctive relief with respect to the process used in and the outcome of the Corps' re-evaluation of a permit originally issued by the Corps under § 404 of the Federal Water Pollution Control Act ("FWPCA"), 33 U.S. C. § 1344, to defendant Riverport Associates in May 1985. The original permit allowed certain activities, not expressly including nor prohibiting construction of a stadium, by the private entity defendants on part of the Missouri River Bottoms floodplains, including some wetlands, in St. Louis County, Missouri ("the Riverport area"). The original permit was modified on March 4, 1987. The Corps' re-evaluation at issue here resulted in a "Memorandum of Record," issued June 22, 1987, that essentially allows the construction of a domed stadium, and related parking facilities, in the Riverport area pursuant to the original permit  without the processing of a new application for a permit, and without suspension, modification, or revocation of the original permit. Plaintiffs allege that the Corps' re-evaluation involved violations of Sections 404 and 505 of the FWPCA, 33 U.S.C. §§ 1344 and 1365;[1] the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321, et seq.; the Fish and Wildlife Coordination Act of 1934 ("FWCA"), as amended, 16 U.S.C. § 662; the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, et seq.; the Clean Air Act ("CAA"), 42 U.S.C. § 7506(c); and the regulations promulgated pursuant to each Act. In particular, plaintiffs contend the Corps failed properly to evaluate traffic congestion and safety factors, air pollution factors, surface water run-off from the parking lots, regional economic impacts, and the cumulative impact of the purportedly piecemeal implementation of St. Louis County's plan to develop the Missouri Bottoms. Additionally, plaintiffs urge the Corps should have prepared an Environmental Impact Statement.
Defendants, including St. Louis County which intervened as a defendant, deny liability, and urge the Corps' re-evaluation was not either unreasonable or arbitrary and capricious.
The principal question presented here is whether or not the Corps acted arbitrarily, capriciously, or unreasonably concerning the environment in this cause. The answer is no.
Having carefully considered the pleadings, testimony, exhibits, stipulations, memoranda, and relevant record, the Court makes and enters the following findings of fact and conclusions of law.

Findings of Fact
1. Plaintiff Missouri Coalition for the Environment ("Coalition") is a corporation organized and existing under the Illinois not-for-profit corporation laws, with its principal office in Missouri.
2. Plaintiff The City of St. Louis is a municipal corporation within the Eastern District of Missouri organized and existing as a constitutional charter city pursuant to the Missouri Constitution.
3. Plaintiff League of Women Voters of St. Louis County is a corporation organized and existing under the general not-for-profit laws of the State of Missouri, maintaining its principal office in St. Louis County, Missouri.
*793 4. Plaintiff The League of Women Voters of St. Louis is a corporation organized and existing under the general not-for-profit laws of the State of Missouri.
5. Plaintiff The Open Space Council for the St. Louis Region is a corporation organized and existing under the not-for-profit corporation laws of the State of Missouri, with its principal office in the City of St. Louis, Missouri.
6. Plaintiff Lee Streett is a resident, property owner, and taxpayer of St. Louis County, and a former member of the Board of Directors of plaintiff Coalition.
7. Plaintiff Martin E. Gardner, Jr., is a resident, property owner, and taxpayer of St. Louis County, and a former President of the Open Space Council.
8. Plaintiff Cornelius Alwood is a resident of St. Louis County, Missouri.
9. Plaintiff Donald F. Weiler resides in the City of Maryland Heights, Missouri, which is in St. Louis County.
10. Plaintiff Stanley J. Adams resides in the City of Bridgeton, Missouri, which is in St. Louis County.
11. Plaintiff Beverly J. Toner resides in Maryland Heights, Missouri. She is a property owner and taxpayer of St. Louis County.
12. Plaintiff Mark D. Conner is a resident, property owner, and taxpayer of the City of St. Louis, Missouri.
13. A. Defendant Corps is an agency of the United States and a branch of the United States Army.
B. Defendant John O. Marsh, Jr., is the duly appointed and acting Secretary of the Army.
C. Defendant Robert K. Dawson was in 1986 the duly appointed and acting Assistant Secretary of the Army for Civil Works.
D. Defendant Lt. Gen. E.R. Heiberg, III, is the duly appointed and acting Chief of Engineers of the Corps.
E. Defendant Robert M. Amrine was in 1985, 1986, and the first half of 1987, the duly appointed and acting District Engineer for the Corps, Kansas City District (hereinafter "district engineer"). Defendant John H. Atkinson, III, is his successor in that office.
These defendants are hereinafter sometimes collectively referred to as the "Corps defendants." In relevant part, the Corps defendants, pursuant to delegations of authority by Congress and by regulation, are charged with administration and enforcement of § 404 of the FWPCA, 33 U.S.C. § 1344, subject to the Guidelines of the United States Environmental Protection Agency.
14. Defendant Riverport, Inc., and defendant Sverdrup Corporation are corporations incorporated under the laws of the State of Missouri. Defendant Riverport Associates is a Missouri limited partnership. Defendant Riverport, Inc., is general partner thereof. These defendants will be referred to collectively as "Sverdrup" or "the Sverdrup defendants."
15. Defendant St. Louis County, Missouri, is a first class county operating under a charter form of government within the Eastern District of Missouri. This defendant now owns the property on which the proposed stadium will be built.
16. In the course of the trial, plaintiffs' standing was conceded.

ADMINISTRATIVE PROCEEDINGS CONCERNING ORIGINAL PERMIT
17. On October 25, 1983, the Corps received a permit application from Riverport Associates in connection with the development known as "Riverport."
18. The Riverport site comprises approximately 450 acres in western St. Louis County, Missouri, east of the Missouri River and south of I-70. This acreage contains wetlands and Missouri River floodplains commonly referred to as the Missouri Bottoms.
19. The Riverport development as originally planned was to include retail buildings, restaurants, entertainment facilities, office buildings, and industrial activities sharing a unified theme and plan.
20. The application stated that Sverdrup would be constructing a 4,100-foot-long *794 levee designed to protect Riverport from a 500-year flood.
21. Because an 800-foot-long portion of the levee crossed some wetlands, the project required the Corps' approval prior to construction.
22. In relevant part, the aforementioned permit application was filed under Section 404 of the FWPCA (also referred to as the Clean Water Act of 1977), 33 U.S.C. § 1344, which requires a permit for the placement of fill in wetlands.
23. Upon review of the permit application, the Corps issued a public notice on January 20, 1984. The notice informed federal, state, and local agencies and the public of the Riverport permit application, and requested comments thereon.
24. Numerous federal, state, and local agencies, as well as private organizations and individuals, responded to the public notice.
25. The comments addressed a host of potential environmental, engineering, and planning concerns, including, without limitation, the following: wetlands, prime farmland, endangered species, flooding and floodplain management, alternatives, and cumulative impacts.
26. On June 25, 1984, the St. Louis County Council approved two ordinances rezoning the Riverport site for use as proposed. The zoning ordinances require Sverdrup to undertake a number of specific commitments, including those designed to minimize the impact of the new development on traffic.
27. On October 1, 1984, the Corps conducted a public hearing on the Riverport application.
28. A large number of agencies, organizations, and individuals spoke or submitted comments at and after the hearing. Among the organizations participating in the hearing were the Missouri Coalition for the Environment, the Open Space Council, and the League of Women Voters.
29. During the Corps' review, Sverdrup modified the design and construction plans for Riverport, reducing the amount of wetlands impacted from 28 to 2.8 acres. In addition, the modifications included Sverdrup's commitment to add an additional 10 acres of wetlands by purchasing a 10-acre parcel riverward of the Riverport levee and creating new, higher quality wetlands there. As a result of the modifications, the Corps concluded that the wetland loss would be fully mitigated by increasing the existing wetland acreage, as well as by enhancing wetland quality and diversity. No other agency challenged that conclusion. The Fish and Wildlife Service of the Department of Interior ("FWS") expressly approved the mitigation proposal.
30. On April 19, 1985, the Missouri Department of Natural Resources ("MDNR") issued a "water quality certification" for Riverport in accordance with the Clean Water Act of 1977, 33 U.S.C. § 1251, et seq.
31. Pursuant to a Memorandum of Agreement between the Departments of the Army and Interior under Section 404(q) of the Clean Water Act, 33 U.S.C. § 1344(q), the FWS may "elevate" (appeal) a proposed decision of the Corps to issue a wetlands permit. When elevation is invoked, the final decision of the Corps may not rest with the District Engineer. Instead, his decision may be reviewed by higher level Army officials.
32. The FWS responded to the District Engineer's proposed decision by stating that the proposed permit conditions "will adequately mitigate for the project's impacts on fish and wildlife resources," so the FWS did not exercise its authority to require reconsideration of the District Engineer's decision by higher level Corps officials.
33. The Environmental Protection Agency ("EPA") stated no objection to the proposed issuance of the Riverport permit.
34. On May 1, 1985, the Corps completed its evaluation of the Riverport permit application, No. 2151, together with an Environmental Assessment ("EA") and Statement of Findings pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq. The Corps discussed the potential impacts of the Riverport project upon the environment, and specifically *795 found that there would be no significant impacts. Therefore, the Corps concluded an Environmental Impact Statement ("EIS") was not required.
35. The Corps' District Engineer, Col. Robert M. Amrine, summarized as follows the findings of the Corps' public interest review, pursuant to Section 404 of the Clean Water Act and the Corps' regulations thereunder:
I find that issuance of a Department of the Army permit to Riverport Associates as prescribed by regulations published in 33 CFR 320-330, is based on a thorough analysis and evaluation of the various factors enumerated above; that there are no reasonable alternatives available to the applicant that will achieve the purposes for which the work is being considered; that the work is in accordance with the overall desires of the public as reflected in the comments of State and local agencies and the general public; that the work is deemed to comply with established State and local laws, regulations, and codes; that there have been no identified, significant, adverse, environmental effects related to the work; that issuance of this permit is consonant with national policy, statutes, and administrative directives; and that on balance the total public interest should best be served by issuance of the Department of the Army permit.
36. The permit became fully effective on May 16, 1985, after it was signed by both Sverdrup and the Corps.
37. As originally issued, the Riverport permit authorized Sverdrup to discharge (a) approximately 53,600 cubic yards of fill material into wetlands for construction of an 800-foot-long portion of the 4,100-foot levee; (b) approximately 17 cubic yards of rock for construction of a stilling basin and outfall channel, and (c) a small quantity of fill for minor grading in wetland areas to improve drainage.

THE INCLUSION OF A DOMED STADIUM IN RIVERPORT
38. In early 1985, the County Executive of St. Louis County ("the County Executive") proposed that a domed stadium be built in St. Louis County to accommodate area sports concerns.
39. In February 1985, the County Executive approached Sverdrup to inquire whether it would be interested in redesigning the proposed Riverport development to include a domed stadium. Sverdrup indicated it was not interested in having such a stadium in Riverport.
40. In March 1985, the Corps asked Sverdrup whether its plans for Riverport had changed to include a stadium. On March 29, 1985, Sverdrup wrote to the Corps that it had no plans to include a domed stadium in Riverport.
41. The County Executive returned to Sverdrup and persisted with his proposal (by then in somewhat scaled-down form) for a stadium in Riverport.
42. On November 12, 1985, the Corps learned that St. Louis County ("the County") proposed to acquire property at the Riverport site for the construction of a domed stadium.
43. Following the County's announcement in November 1985 of its proposal for a domed stadium in Riverport, and the sale in December 1985 by Sverdrup to the County of 100 acres within Riverport, some opposition was heard.
44. As a result of the proposed inclusion of a domed stadium in Riverport, the Corps commenced a reevaluation of the circumstances and conditions of the original permit pursuant to the Corps' regulations, in particular 33 C.F.R. § 325.7 (1987) ("reevaluation regulation").
45. Under the Corps' reevaluation regulation, both in language and in practice, the reevaluation process is extremely informal. There are no procedural requirements (such as notice and/or comment), and the method of proceeding is committed to the discretion of each District Engineer in each case of reevaluation.
46. The Corps requested additional information from Sverdrup concerning the proposed location of a stadium within Riverport, and additional parking facilities outside and south of the Riverport levee.
*796 47. Corps personnel inspected the site and identified several wetland areas south of the Riverport project location.
48. The County furnished a drawing of its plans to locate the stadium and adjacent parking, together with a letter asserting (a) its intention to avoid disturbance of wetlands in its siting of the parking facilities outside the levee; (b) existing roads were adequate to serve the stadium; and (c) a levee to protect the additional parking was not economically feasible since the probability of its flooding is remote.
49. A copy of the information supplied by Sverdrup and the County was furnished to the EPA, the FWS, the MDNR, and the Missouri Department of Conservation ("MDC").
50. During the reevaluation, the Corps examined the potential impacts of the proposed stadium, plus related parking facilities both inside the levee (within the 100 acres purchased by the County for the stadium) and outside the levee (approximately an additional 150 acres).
51. The Corps obtained numerous submissions from Sverdrup and St. Louis County, as well as extensive comments from federal, state, and local agencies, private organizations (including plaintiffs and their experts), and individuals.
52. Before the District Engineer reached a final decision on the stadium reevaluation, virtually the same plaintiffs as those herein (except for the City of St. Louis and four individuals), filed Missouri Coalition for the Environment v. Corps of Engineers, No. 86-2229C(2) (E.D.Mo., filed June 25, 1986) ("Riverport I"). That case was plaintiffs' initial judicial challenge to the issuance of the original permit and the proposed inclusion thereafter of a domed stadium. The Court in that case dismissed without prejudice plaintiffs' complaint to the extent it addressed the domed stadium proposal, on the ground such a claim was not ripe for review because the Corps had not completed its reevaluation.
53. On March 4, 1987, in connection with the payment to plaintiffs of $100,000 and the settlement of the claims remaining in Riverport I, the Corps issued a permit modification authorizing the placement of fill in additional wetlands in connection with (a) the construction of a haul road used to bring in materials to build the levee, and (b) the widening of the Earth City Expressway near the entrance to Riverport. The modified permit also expanded upon and formalized a condition in the original permit that Sverdrup create 13, rather than 10, acres of new wetlands as mitigation for the wetlands being filled.
54. In the Consent Decree settling Riverport I, plaintiffs dismissed with prejudice any and all claims against the issuance of both the original Riverport permit and the above-mentioned permit modification. Plaintiffs also reserved the right "to assert all claims and allegations concerning the stadium and related parking lots outside the Riverport levee."
55. In the consent decree, the parties also noted:
Special Condition WW [of the permit, as modified March 4, 1987] states: "The permittee agrees to ensure that the quality of water entering the wetland mitigation area will be such that it will not adversely affect the flora and/or fauna that inhabit the area." A question has arisen concerning the construction of such language. By means of clarification, the Corps intended in Special Condition WW that Sverdrup take all reasonable steps under its control to ensure that the surface water runoff from the Riverport project will not contain contaminants or pollutants in quantities sufficient to significantly threaten the existence of any portion of the wetland ecosystem.
56. In March 1987, Corps officials requested yet additional information concerning the possible need for additional roadways which might impact more wetlands, other developments that might be planned for the area, and air quality.
57. The Corps requested considerable information from Sverdrup and the County and received comments from, among others, numerous federal, state, and local entities (i.e., the FWS, the EPA, the Federal *797 Emergency Management Agency, the National Park Service, the MDC, the MDNR, the Missouri Highway and Traffic Commission, the Missouri Attorney General's Office, the City of Florissant, St. Charles County, the City of St. Louis Community Development Agency, the Mayor of St. Louis, and the City of Maryland Heights). In addition, the Corps received substantial input from plaintiff organizations, and numerous other organizations and individuals.
58. The Corps considered the 22 depositions and thousands of documents and reports produced in Riverport I, which included plaintiffs' stadium claims, from the filing of the suit in June 1986 through the close of discovery in January 1987 when certain claims were dismissed for lack of ripeness.
59. The reevaluation process took some 16 months. This "informal" procedure, which ran from December 1985 through June 1987 (with a brief hiatus after Riverport I was initially filed), generated an administrative record of some 66 pounds.
60. Mel Jewett, Chief of the Corps' Regulatory Branch, testified on deposition that this was the most comprehensive permit reevaluation by the Kansas City District during at least the last 10 years.
61. In challenging the procedure utilized by the Corps in the present permit reevaluation, plaintiffs claim that there should have been a "public interest review," with a formal notice issued and comment invited.
62. Under the Corps' regulations, see, e.g., 33 C.F.R. §§ 325.2, 325.3, a public interest review (which typically occurs when an initial permit application is filed), involves the issuance of a "notice" to interested agencies and individuals and the submission of such written comments as those noticed may choose to offer. In this case, the Corps similarly invited comments from all interested parties and sent copies of key correspondence to them as well.
63. In the Corps' discretion, it may or may not also involve a public hearing. 33 C.F.R. § 327.4 (1987). This case had what amounted to a seven-month public hearing, featuring not only lay speakers but a parade of experts (mostly plaintiffs'), providing deposition testimony and written reports and comments. All of the arguments raised by plaintiffs in this lawsuit, and portions of all of the experts offered by plaintiffs at trial, were considered by the Corps during the reevaluation process.
64. On June 22, 1987, the Corps issued a Memorandum for Record based on the District Engineer's conclusions, stating that the inclusion of a domed stadium within Riverport required neither a new permit nor a change in the existing permit. This Memorandum of Review constitutes final agency action within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704.
65. The reevaluation under 33 C.F.R. § 325.7 (1987) consisted of a two-prong analysis: (a) whether there was a significant increase in scope of the permitted activity from the original permit, as modified, thereby requiring a new or separate permit, 33 C.F.R. § 325.7(a) (1987); and (b) if not, whether action to modify, suspend, or revoke the existing permit was necessary, 33 C.F.R. § 325.7(b)-(d) (1987).
66. First, the Corps found that there was no significant increase in the scope of the permitted activity. The activity permitted under the Riverport permit was the placement of fill in wetlands, and neither the substitution of a stadium for other activities within Riverport, nor the addition of parking facilities outside the Riverport levee, involved the fill of any wetlands. Thus, a new permit was not required.
67. Second, the Corps found that the proposed changes in the Riverport project did not require a modification, revocation, or suspension of the Riverport permit because the potential environmental impacts of the revised project (the originally permitted activity with the proposed domed stadium included as part of the Riverport development) were substantially similar to those thoroughly evaluated prior to the issuance of the original permit.
68. In determining whether the permit should be modified, suspended, or revoked in the public interest, the Corps considered *798 twenty-eight different environmental and other impacts.
69. The District Engineer concluded that the revised project would result in potentially significant changes in only two impacts, recreational and economic.
70. The proposed stadium project would shift the location of certain available recreation resources from downtown St. Louis to the Riverport site.
71. The Corps reviewed an economic study prepared by Team Four, Inc., and considered concerns expressed by the Mayor of the City of St. Louis.
72. The District Engineer concluded that adverse economic impacts felt in some locations are mitigated to some extent by the beneficial impacts occurring in others.
73. The District Engineer concluded that the change in economic and recreation impacts due to the revised project does not warrant modification, suspension, or revocation of the Riverport permit.
74. The Corps considered both practicable alternatives to the stadium itself and to the revised project as a whole.
75. The Corps concluded that there were no practicable alternative sites for the revised project.
76. The Corps considered fully the views of plaintiffs' traffic expert, Paul C. Box. The Corps reviewed his deposition in Riverport I, his initial written report, and his comments on reports submitted by Sverdrup's expert and St. Louis County.
77. The Corps also considered a report prepared for Sverdrup by Wilbur Smith & Associates, an independent consultant with a national reputation in traffic engineering, and a separate report submitted by the St. Louis County Department of Highways.
78. The Corps then asked the Missouri Highway and Traffic Commission ("MHTC") for its evaluation of the conflicting conclusions of the experts. MHTC agreed with Sverdrup's consultant and the County that the existing road network, plus improvements thereto already underway, would adequately serve the traffic generated by the stadium.
79. It is noteworthy that the many traffic experts are in substantial agreement concerning the underlying data. They diverge only in the conclusion they draw from the data.
80. Considering all the foregoing reports, the District Engineer determined that the existing road system, augmented by the improvements to I-70 which the State is about to make, the improvements to the I-70 interchange and a portion of the Earth City Expressway that are part of the original Riverport project, and the use of traffic management plans for stadium events will provide minimally acceptable road access to the revised project.
81. The Corps also considered the potential cumulative effects of the Riverport project in light of past, present, and reasonably foreseeable future projects in the area.
82. The Corps noted that each of the reasonably foreseeable future projects in the general area (i.e., roadway improvements involving Route 115, Page Avenue, and the Earth City Expressway) are or will be subject to extensive environmental review.
83. With respect to the air quality impacts of the revised project, the Corps considered the facts that the St. Louis area has not yet attained federal limitations for the pollutant ozone, and that automobile emissions are a source of ozone pollution.
84. The Corps also reviewed information on air quality provided by the Missouri Coalition for the Environment, its expert witness, and St. Louis County.
85. Both the Corps and the Coalition provided information on air quality to the EPA, which is the federal agency responsible for implementing the Clean Air Act.
86. EPA responded to the Corps' inquiries concerning air quality by stating that there are no regulations at the federal level that control indirect sources of air pollution such as automobile emissions, and that the Missouri State Implementation Plan places no restriction on indirect sources of air pollution.
*799 87. The District Engineer concluded that he would not modify, suspend, or revoke the existing permit based on air quality.
88. The Coalition wrote to the EPA outlining the Coalition's air quality concerns and asking it to take all steps necessary to assure that the Riverport permit is revoked.
89. The EPA did not assert its veto authority concerning either the issuance of the original Riverport permit or the Corps' decision on reevaluation. Although the Corps is the federal agency charged with issuing or denying permits for projects affecting wetlands, the EPA may override the Corps' decision if the proposed activity "will have an unacceptable adverse effect" on the environment. 33 U.S.C. § 1344(c).
90. The Corps contacted the National Park Service ("NPS") and confirmed that the Riverport development would not have an adverse impact on the Lewis and Clark Trail.
91. The Corps looked at the impacts of floodplain development and concluded that the addition of the stadium did not result in significant impacts on the floodplain.
92. There is conflicting testimony of record as to the importance of the St. Louis County area as a bald eagle habitat. One of the conditions of the original permit, a condition not changed through any modification or revision of the project insofar as the available record indicates, states:
The permittee agrees to minimize disturbance to bald eagle populations that may use the forested area adjacent to the Missouri River by: (1) limiting construction of the outfall channel to the spring and summer months; (2) minimizing the clearing of large trees in this area; and (3) siting industrial or commercial activities nearest this area that would create the least traffic and human activity.
93. The District Engineer determined that the existing permit would remain in effect and did not require modification, suspension, or revocation as a result of the proposed stadium project.
94. The proposed issuance of the original Riverport permit was presumed to be a major federal action, and the Corps prepared an EA. As a result of the EA, the Corps found that the permit would not create significant environmental impacts and, therefore, an EIS was not prepared.
95. In Riverport I, plaintiffs challenged the adequacy of the Riverport EA and claimed that an EIS should have been prepared. They later, on payment of $100,000, dismissed those claims with prejudice.
96. In this case, by contrast, no Corps permit was issued or even modified. The Corps simply conducted an informal proceeding known as a "reevaluation" and determined that the substitution of a domed stadium for unspecified retail-commercial-industrial activities required neither a new permit nor a modification, revocation, or suspension of the existing permit.
97. Although the Corps' reevaluation regulation has no procedural mandates, and vests broad discretion in each District Engineer to handle each proceeding as he sees fit, the Corps in this case conducted a comprehensive review. The material issues raised by plaintiffs in this suit were considered by the Corps during the reevaluation process, which generated the weighty administrative record said to contain 66 pounds. The opinion of the experts named by the plaintiffs in this case were reviewed by the Corps during its permit reevaluation. Colonel Amrine, a First Division Infantry veteran of the Vietnam War, gave able and persuasive testimony concerning the Corps' thorough evaluation of all concerns. His impartiality was clear and unquestioned.
98. Did the Corps act arbitrarily, capriciously, or unreasonably in issuing its reevaluation decision? The thoroughness and breadth of the Corps' review  particularly in light of the complete lack of formal procedural requirements  precludes plaintiffs from sustaining their rigorous burden of proof.
Upon review of the reevaluation record and other relevant information here, it is not possible to find the Corps acted in an *800 arbitrary, capricious, or unreasonable manner in reaching its reevaluation decision.
Plaintiffs offer criticism of the action or inaction of the Corps, EPA, FWS, MDNR, MDC, MHTC, FEMA, NPS, and St. Louis County government. It is a healthful American trait to distrust government agencies  but to distrust them all at once?

Conclusions of Law
A. The National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321, et seq., is essentially a procedural statute, which seeks to ensure agency consideration of the environmental impact of a proposed action. Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (per curiam).
B. NEPA does
not require agencies to elevate environmental concerns over other appropriate considerations.... Rather, it require[s] only that the agency take a "hard look" at the environmental consequences before taking a major action.... The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.
Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 97-98, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983) (citations omitted).
C. Section 102 of NEPA requires the preparation of an environmental impact statement (EIS) for any major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C).
D. Because the only reason Sverdrup required the original Riverport permit was to fill certain wetlands, and because the substitution of a stadium for other uses involved no additional wetlands fill, no separate permit was found to be required. Because the potential environmental impacts of the revised project were determined not to be appreciably different from those of the original project, the Corps found the existing permit need not be modified, revoked, or suspended. The original decision is not now before the Court and the Corps' reevaluation decision worked no change in the status quo.
The test is not whether this Court would have reached the same result on the same evidence. The question is whether a reasonable person could reach the same result the Corps reached on the same evidence. The Court finds one could.
E. The Corps reasonably concluded under the reevaluation regulation that the revised project would not "significantly increase the scope of the permitted activity" and therefore would not require a new permit, 33 C.F.R. § 325.7(a) (1987).
F. Even assuming NEPA applies, judicial review of an agency's compliance therewith is narrowly circumscribed:
NEPA, while establishing "significant substantive goals for the nation" imposes upon agencies duties that are "essentially procedural." ... [O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot "interject itself within the area of discretion of the executive as to the choice of the action to be taken."
Strycker's Bay Neighborhood Council, Inc., supra, 444 U.S. at 227-28, 100 S.Ct. at 499-500 (emphasis added) (quoting from Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978) and from Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976)).
G. Where a proposed action, such as the issuance of a permit, is a "major federal action," the question for the agency is whether the action will significantly affect the quality of the human environment, and, therefore, require the preparation of an EIS. When an agency determines that a proposed major federal action will not significantly affect the environment and, therefore, that an EIS is not required, the question for the reviewing *801 court is whether the agency's determination was reasonable. Winnebago Tribe of Nebraska v. Ray, 621 F.2d 269, 271 (8th Cir.), cert. denied, 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980).
H. Before the court need address the question of reasonableness, however, the burden is on the plaintiff to make a threshold showing that the agency failed to consider facts which, if true, would constitute a substantial impact on the environment. Id.
I. Plaintiffs, in challenging the Corps' decision not to prepare an EIS, bear the burden of raising a substantial environmental issue based on facts which were omitted from consideration in the administrative record. Olmsted Citizens for a Better Community v. United States, 793 F.2d 201 (8th Cir.1986).
J. In this case, the Corps considered an extremely broad range of environmental impacts potentially associated with Riverport prior to issuing the EA, statement of findings, and permit in May 1985. The issues of alternative sites, cumulative impacts, and secondary impacts such as traffic, air pollution, and economic impacts were addressed by the Corps during its lengthy review of the original Riverport permit application.
K. In this case, the Corps' jurisdiction under Section 404 of the Clean Water Act extends only to wetlands. The Corps' jurisdiction was originally invoked because of an 800-foot portion of a 4,100-foot levee (which has already been constructed under the May 1985 permit). Moreover, although the levee was necessary for the Riverport project, the revision of the project to substitute a domed stadium for unspecified commercial-industrial activities on 100 of the project's 500 acres involves no filling of wetlands. Nevertheless, the Corps went far beyond its limited jurisdiction and considered the environmental impacts of the entire Riverport project, both originally and as revised. In light of these facts, the plaintiffs have not sustained their threshold burden of raising "a substantial environmental issue." Winnebago Tribe of Nebraska v. Ray, supra 621 F.2d at 271.
L. Under Section 701(a) of the Administrative Procedures Act, judicial review is not available to the extent that (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law. 5 U.S.C. § 701(a)(1), (2).
M. Section 701(a)(2) precludes judicial review of the Corps' inaction because an agency's decision not to take enforcement action is presumptively unreviewable by a court. Heckler v. Chaney, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).
N. Corps regulations grant the District Engineer the discretion to modify, suspend, or revoke a permit, but they do not mandate issuance of a new permit or modification of same. 33 C.F.R. §§ 325.7 and 325.8(b) (1987).
O. Enforcement decisions under the Clean Water Act are committed exclusively to the discretion of the Corps. Harmon Cove Condominium Ass'n, Inc. v. Marsh, 815 F.2d 949 (3d Cir.1987).
P. The Corps' decision not to require a new permit or revoke or suspend the existing permit is to be upheld unless proven to be arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).
Q. The case of First National Bank of Fayetteville v. Smith, 508 F.2d 1371, 1376 (8th Cir.1974), cert. denied, 421 U.S. 930, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975), holds:
"Administrative action may be regarded as arbitrary and capricious only where it is not supportable on any rational basis." ... Something more than mere error is necessary to meet the test.... To have administrative action set aside as arbitrary and capricious, the party challenging the action must prove that it was "willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case...."
(citations omitted).
R. Great deference is accorded an administrative agency's interpretation of its own regulations. See, e.g., Moore v. Custis, 736 F.2d 1260, 1262 (8th Cir.1984).
*802 S. The Court does not substitute its judgment for that of the agency, and need only ascertain if there is a rational connection between the facts found and the choice made by the agency. Corning Sav. & Loan Ass'n v. Federal Home Loan Bank Bd., 736 F.2d 479, 480 (8th Cir.1984).
T. The Corps may rely on information provided by the permit applicant concerning its identification and analysis of alternative sites, so long as the agency verifies and evaluates that information. See Friends of the Earth v. Hintz, 800 F.2d 822, 834-35 (9th Cir.1986) (agency's EA); River Road Alliance, Inc. v. Corps of Engineers of U.S. Army, 764 F.2d 445, 452-53 (7th Cir.1985) (agency's analysis of alternative sites), cert. denied, 475 U.S. 1055, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986).
The Corps is not a business consulting firm. It is in no position to conduct a feasibility study of alternative sites.... The Corps has to depend on the parties for such information[.]
River Road Alliance, Inc., supra, 764 F.2d at 453.
U. In this case, the Corps reasonably evaluated the criteria selected for analyzing alternative sites. The Corps then considered eleven potential alternative sites for the entire project as well as two on-site alternatives and a no action alternative and six alternative sites for the stadium.
V. The Corps reasonably concluded that there is no practicable alternative site for the revised Riverport project.
W. The Corps is not required to deny a permit application simply because of any anticipated adverse impacts of future projects.
Since any subsequent applicant ... will have to get a Corps permit too, the Corps will be able to prevent the problem from getting out of hand.
Id. at 452.
X. The record here discloses the Corps evaluated the Riverport project in light of both existing and reasonably foreseeable future projects in the area.
Y. Plaintiffs also contend that the Corps did not adequately consider the potential secondary impacts of the Riverport development  i.e., increased traffic, and the potential for increased air pollution related thereto.
Z. The record amply demonstrates that the Corps did, in fact, consider such potential impacts.
AA. In regard to traffic impacts, the Corps, relying in part on the objective analysis of the MHTC, made the judgment to accept the conclusions of Sverdrup's traffic expert and the St. Louis County Highway Department, rather than the views of plaintiffs' expert.
BB. Plaintiffs now ask this Court to substitute its judgment for the Corps'. That far exceeds the scope of review applicable here. The Corps' decision to accept the conclusions of these traffic experts was plainly not arbitrary, capricious, or unreasonable.
CC. The Corps should not base its permit decision on socioeconomic harms not proximately related to changes in the physical environment since it is not empowered to regulate economic competition between communities or to make political decisions as to which community's economic interests ought to be preferred. Mall Properties, Inc. v. Marsh, 672 F.Supp. 561 (D.Mass. 1987).
DD. The Corps' permit-processing regulations specify that when private entities apply for a permit, "it will generally be assumed [as the Corps did in this case] that appropriate economic evaluations have been completed, the proposal is economically viable, and is needed in the marketplace." 33 C.F.R. § 320.4(q) (1987).
EE. Although prior to implementation of the above regulation, the following cases remain persuasive for the points that mere economic and social impacts are insufficient to require preparation of an EIS, Como-Falcon Community Coalition, Inc. v. U.S. Dept. of Labor, 609 F.2d 342, 345-46 (8th Cir.1979), cert. denied, 446 U.S. 936, 100 S.Ct. 2154, 64 L.Ed.2d 789 (1980); and socioeconomic impacts are not to be considered unless there is a reasonably close causal relationship between such impacts *803 and an impact on the physical environment. Cf. Metropolitan Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 773-74, 103 S.Ct. 1556, 1560-61, 75 L.Ed.2d 534 (1983) (re health and psychological impacts); and Olmsted Citizens for a Better Community, supra, 793 F.2d at 204-05 (re socio-economic impacts). Here, the Corps' evaluation of the economic and recreation impacts (and all others) was not arbitrary, capricious, or unreasonable.
FF. As a matter of law, surface water runoff, such as from the stadium parking lots, is deemed "non-point source runoff," and is not subject to the permitting requirements of the Clean Water Act.
GG. This was made clear by Congress in the Act, 33 U.S.C. §§ 1311, 1314(f), 1362(12), (14), and consistently reaffirmed by the courts. See, e.g., Sierra Club v. Abston Const. Co., Inc., 620 F.2d 41, 43 (5th Cir.1980); United States v. Earth Sciences, Inc., 599 F.2d 368, 373 (10th Cir. 1979) (accelerated runoff of rain water from impermeable surface such as parking lot, carrying with it oil, lead, rubber particles, and other additives from vehicular traffic, is non-point source pollution subject only to analysis, study, and suggestions).
HH. The facts provided to the Corps, and the evidence adduced at trial, demonstrate that the Riverport project will not cause any nonconformance with Missouri's state implementation plans ("SIP"). Therefore, the Corps did not violate Section 176 of the Clean Air Act, 42 U.S.C. § 7506, in issuing the Riverport permit.
II. Section 7 of the Endangered Species Act instructs federal agencies, in consultation with the FWS, to ensure that their actions are not likely either (1) to jeopardize the continued existence of an endangered species, or (2) to destroy or modify adversely any critical habitat of an endangered species. 16 U.S.C. § 1536.
JJ. Judicial review of an agency's compliance with the Endangered Species Act is governed by the arbitrary and capricious standard of the Administrative Procedures Act, 5 U.S.C. § 706(2)(A). Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson, 685 F.2d 678, 686 (D.C.Cir.1982).
KK. In this case, although the bald eagle may be present in the project area, the original Riverport project was determined to be not likely to jeopardize its continued existence. Moreover, permit conditions were incorporated in the Riverport permit to minimize any effect of the project on the bald eagle.
LL. There is no critical habitat of the bald eagle in the project area.
MM. The revision of the Riverport project to include a domed stadium causes no additional impacts, if any, to the bald eagle.
NN. The Corps acted in compliance with the Endangered Species Act, and did not act arbitrarily or capriciously in its reevaluation of the Riverport permit.
OO. Plaintiffs' reliance on the Fish and Wildlife Coordination Act ("FWCA"), 16 U.S.C. § 661, et seq., is misplaced.
PP. There is no private right of action to enforce the FWCA. Environmental Defense Fund, Inc. v. Alexander, 501 F.Supp. 742, 766-67 (N.D.Miss.1980); Trinity County v. Andrus, 438 F.Supp. 1368, 1383 (E.D.Cal.1977); Sierra Club v. Morton, 400 F.Supp. 610, 640 (N.D.Cal. 1975), aff'd in part, rev'd in part on other grounds sub nom. Sierra Club v. Andrus, 610 F.2d 581 (9th Cir.1979).
QQ. Moreover, an agency's compliance with NEPA automatically satisfies the requirements of the FWCA. State of Missouri ex rel. Ashcroft v. Department of the Army, Corps of Engineers, 526 F.Supp. 660, 677 (W.D.Mo.1980), aff'd on other grounds, 672 F.2d 1297, 1303 (8th Cir.1982); Enos v. Marsh, 616 F.Supp. 32, 64-65 (D.Haw.1984), aff'd on other grounds, 769 F.2d 1363 (9th Cir.1985).
RR. Furthermore, the record shows the Corps consulted with the FWS. Plaintiffs' claims under the FWCA are without merit.

OBITER DICTA
Through evidence and argument it was urged upon the Court that:

*804 (a) the stadium should be located in the downtown core of the metropolitan area;
(b) two stadia in one metropolitan area are unsuitable; and
(c) a stadium should not be placed in a floodplain.
Must we ignore as judges what we know as sports fans?
Kansas City, Missouri, has two stadia, built side by side.
Both are miles from the downtown core of the metropolitan area.
The Dallas Cowboys play in Irving, Texas.
The Detroit Lions play in Pontiac, Michigan.
New York professional football teams play in New Jersey.
It should be unnecessary to remind St. Louisans where the Minnesota Twins play.
It is not in Minneapolis or St. Paul.
The New Orleans Superdome is located in the downtown core of that metropolitan area.
It is also in the heart of a great floodplain.
A page of experience is worth a pound of logic. Justice Oliver Wendell Holmes, Jr. gave us this lesson over a century ago. O.W. Holmes, The Common Law, at 1 (1881).
Judges regularly urge jurors to take their common sense into their deliberations. Perhaps sometimes judges may do likewise.

ORDER
Findings of fact and conclusions of law dated this day are hereby incorporated into and made a part of this order.
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that plaintiffs take nothing by their cause of action against defendants, and the claims against the defendants are dismissed on the merits at plaintiffs' costs.
NOTES
[1] The claim under this statutory provision was dismissed by order dated November 23, 1987. A claim that defendants' conduct may violate local zoning ordinances was also dismissed by that order.